PAUL F. ROEMER, JR., AND MARCIA E. ROEMER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3837–74, 3838–74, 3915–74.     Filed December 12, 1977.

Paul F. Roemer, Jr., pro se.
Robert S. Brickell, pro se.
*Julian N. Stern* and *Robert C. Alexander,* for the petitioners in docket No. 3915–74.
*Lawrence G. Becker,* for the respondent.

[1] Cases of the following petitioners are consolidated herewith: Robert S. Brickell and Roberta A. Brickell, docket No. 3838–74; and Harry T. Holgerson, Jr. and Mary E. Holgerson, docket No. 3915–74.

FORRESTER, *Judge:* In these consolidated cases, respondent has determined deficiencies in petitioners' Federal income taxes as follows:

| Petitioners | Taxable year | Amount |
|---|---|---|
| Paul F. Roemer, Jr., and Marcia E. Roemer, docket No. 3837–74 | 1968 | $20,817.55 |
| | 1969 | 4,837.21 |
| Robert S. Brickell and Roberta A. Brickell, docket No. 3838–74 | 1968 | 23,727.94 |
| | 1969 | 90.67 |
| Harry T. Holgerson, Jr., and Mary E. Holgerson, docket No. 3915–74 | 1964 | 1,883.05 |
| | 1965 | 133,754.58 |
| | 1966 | 221,513.25 |
| | 1967 | 385,666.48 |
| | 1968 | 428,111.80 |
| | 1969 | 207,583.51 |

Concessions having been made, there are two issues remaining for our decision: (1) Whether certain amounts designated as interest are deductible by petitioners, pursuant to section 163(a),[2] for the years in question, and (2) whether the petitioners' deduction of prepaid interest in the year of payment distorts their income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners reside in California at the time they filed their petitions herein. They filed Federal income tax returns for the years in issue with the offices of the Internal Revenue Service at San Francisco, Calif. (for some of the years at issue in docket No. 3915–74), and Ogden, Utah.

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

Petitioner Harry T. Holgerson, Jr. (Holgerson), was in the business of buying and selling used airplane parts, and there was a substantial increase in his income from that business for the years 1967, 1968, and 1969. Dale Kimbell (Kimbell), a certified public accountant, kept Holgerson's books during the years in issue and advised him of his potential increased income tax liabilities arising from his increased income during those years. Kimbell suggested that one of the means available to Holgerson for reducing his potential tax liability would be prepayment of interest on investments which he made. The ability to characterize a portion of the funds paid by him as prepaid interest was a factor which Holgerson considered favorably when choosing investments, but his prime consideration was that the investment be a good one which would provide income for him during his retirement years.

### 1. *Walgro*

On December 13, 1967, Holgerson and his wife, Mary (the Holgersons), agreed with Walnut Growers, Inc. (Walgro), Walgro shareholders, and their wives to purchase approximately 631 acres of farmland together with trees and improvements (Walgro property). Such agreement read in part as follows:

#### D. SALE: WALGRO TO HOLGERSONS

\*     \*     \*     \*     \*     \*     \*

2. *Agreement.*

Now, THEREFORE, Holgersons hereby agree to buy from Walgro, and Walgro hereby agrees to sell to Holgersons, the Property * * * pursuant to the terms and conditions of this General Agreement.

3. *Price.*

The total purchase price for the Property shall be $1,955,250.00.

4. *Terms of Payment.*

Holgersons shall pay this purchase price as follows:

a. *Cash.* A down payment by Holgersons into the escrow of $25,000 in cash.

b. *Assumption of Indebtedness.*

(1) Assumption by Holgersons of all of the indebtedness set out * * * above, a total of $957,075.50 principal, plus interest, it being understood that proration of interest on this indebtedness shall be made between Walgro and Holgersons as of the closing date of this sale.

\*     \*     \*     \*     \*     \*     \*

c. *Promissory Note.* A promissory note from Holgersons to Walgro for the remaining $973,174.50. * * *

\* \* \* \* \* \* \*

5. *Prepayment of Interest.*

Concurrently with this sale, the Holgersons shall pay to Walgro, and Walgro shall accept, the sum of $250,000.00, as prepayment of interest on the note referred to in D4c, above, to be applied to such installments of interest to fall due under that note on or before February 1, 1976, as Walgro may at its option designate.

On or about December 13, 1967, Holgerson made the $25,000 and $250,000 payments and assumed the $957,075.50 indebtedness. On December 13, 1967, the Holgersons executed the $973,174.50 promissory note providing for interest on the unpaid principal balance at a rate of 7 percent from December 13, 1967, until December 13, 1977, and thereafter at a rate of 4½ percent until final payment of the principal. Such interest was payable in installments beginning February 1, 1968, with subsequent interest payments payable annually thereafter on the first day of February, and principal payments were to be made annually beginning on February 1, 1978, in the amount of $48,658.72.

In addition to the prepaid interest, Holgerson made further interest and principal payments on the December 13, 1967, note as follows:

| Year | Interest | Principal |
|------|----------|-----------|
| 1968 | $9,257.50 | 0 |
| 1969 | 68,122.22 | 0 |
| 1970 | 68,122.22 | 0 |
| 1971 | 68,122.22 | 0 |
| 1972 | 68,122.22 | 0 |
| 1973 | 22,488.88 | 0 |
| 1974 | 0 | 0 |
| 1975 | 0 | 0 |
| 1976 | 0 | 0 |

No interest payments were made for 1974–76, and a reduced payment was made in 1973, because Walgro applied the $250,000 interest prepayment to the interest requirements of the note for those years. The Holgersons leased the Walgro property back to Walgro as part of the same transaction in which they purchased it. Such lease provided in part as follows:

5. *Schedule of Rentals.* Lessee shall pay to Lessor, as rental for the Property, the following sums on the dates indicated:

|                              | *Amount of* |
| *Date*                       | *rental payment due* |
| Jan. 31, 1968 ........................................... | $15,000 |
| Oct. 30, 1968 ................................................ | 0 |
| Jan. 31, 1969 ........................................... | 45,000 |
| Oct. 30, 1969 ................................................ | 0 |
| Jan. 31, 1970 [and each Jan. 31 of succeeding years up to and including 1977] ................................. | 55,000 |
| Oct. 30, 1970 [and each Oct. 30 of succeeding years up to and including 1977] ................................. | 77,500 |

\* \* \* \* \* \* \*

6. *Duties of Lessee.* In addition to the duty to pay the rentals set out in 5, above, Lessee shall have the following duties toward Lessor:

(a) *Farming.* To continue the farming operations on the Property, and to conduct these operations in a good and farmer-like manner. Lessee shall not, however, be liable for the consequences of any force majeure, which shall be defined as any cause not within Lessee's reasonable control, such as an act of God (e.g., lightning; fire; extraordinary drought, flood, or freezing; earthquake; epidemic, etc.); a riot or labor disturbance; a governmental act or decree; etc.

\* \* \* \* \* \* \*

(d) *Other expenses of farming operations.* To pay all expenses arising out of the farming operations on the Property, and to indemnify Lessor against any and all expenses Lessor may reasonably incur as a result of these operations.

Approximately 250 acres of the Walgro property had been planted with new walnut trees shortly prior to the Holgersons' purchase of the property, and all of the orchards were in an early stage of development. The Holgersons reported losses from the Walgro property as follows: $252,349 in 1967, $166,332 in 1968, and $239,713 in 1969.

The $250,000 paid by the Holgersons under the December 13, 1967, agreement and designated as prepaid interest was deducted as interest by the Holgersons on their 1967 return. In his statutory notice, respondent determined that the amount paid the Holgersons as prepaid interest was deductible beginning December 13, 1967, at a rate of 5.7732 percent per year of the outstanding principal.

## 2. *City Annex*

On November 23, 1968, the Holgersons executed and mailed to

Aerojet-General Corp. (Aerojet) an offer to purchase from Aerojet the property located in Sacramento, Calif., known as City Annex. The City Annex property consisted of approximately 31.41 acres of land on which there was a manufacturing plant and a warehouse.

Such offer read in part as follows:

1. *Purchase price and payment therefor.* The total purchase price shall be the sum of $2,650,000. The Buyer shall pay the purchase price at the closing of the escrow referred to herein by executing and delivering to the Seller a promissory note in the usual form in the principal amount of $2,650,000, secured by a deed of trust in the usual form on the property. Such promissory note shall bear interest as set forth herein and provide for payments of principal and interest as follows:

(a) At the closing, and on May 1, 1969, Buyer shall pay an amount equal to three years in prepaid interest (computed at 7% per annum) in this manner:

(i) At closing $400,000. The Buyer shall deposit $50,000 of such $400,000 in escrow at the opening of the escrow referred to herein.

(ii) On or before May 1, 1969, the balance of such prepaid interest.

(b) On February 1, 1969, and on the first day of each month thereafter until December 31, 1969, the sum of $15,000. By arrangements to be effected through the escrow referred to herein, each of such $15,000 monthly payments shall be deposited in an interest bearing account, subject to the following conditions:

(i) During the period beginning February 1, 1969, and ending December 30, 1970, the Buyer may withdraw all or any part of such payments, including any interest earned by such account, only for the purpose of making capital improvements upon the property to satisfy the requirements of a tenant or tenants of the Buyer who have requested capital improvements as part of their transaction with Buyer.

(ii) On January 1, 1971, the Seller shall have the unrestricted right to withdraw any of the remaining funds, with accrued interest, and the principal of such promissory note shall be credited with the amount withdrawn, but any interest earned by such account and not previously withdrawn by the Buyer, shall be paid to the Seller without credit to the principal and interest of such promissory note.

\* \* \* \* \* \* \*

(c) On January 1, 1970, and on the first day of each month thereafter until December 31, 1971, the sum of $10,000 plus 50% of gross rents received by the Buyer during the preceding calendar month, excluding from such gross rents an amount equal to the monthly rent of $27,023.74 payable by the State of California under its present lease. Such payments shall be applicable to the principal of the promissory note.

(d) (i) On January 1, 1972, and on the first day of each month thereafter until December 31, 1974, the minimum sum of $15,000, or $10,000 plus 50% of gross rents received by the Buyer during the preceding calendar month \* \* \*

(ii) On January 1, 1972, the Buyer is granted the right and option to prepay

interest in one or more installments of prepaid interest for the period beginning January 1, 1972 and ending December 31, 1975.

(e) On January 1, 1975, and on the first day of each month thereafter until December 31, 1977, the minimum sum of $20,000, or $10,000 plus 50% of gross rents received by the Buyer during the preceding calendar month * * *

(f) On or before December 31, 1978, all remaining payments of principal and interest at 8% per annum shall be made. In any event, any unpaid principal and interest shall become due and payable at the end of ten years from the closing.

(g) The Buyer, however, shall have the right to prepay principal at any time without penalty. * * *

On November 25, 1968, the Holgersons' offer was signed on behalf of Aerojet by Robert Mackenzie, president, and James N. Ebright (Ebright), secretary and general counsel. On November 25, 1968, Ebright read to Julian Stern (Stern), attorney for the Holgersons, over the telephone a letter addressed to Stern from Ebright suggesting several changes in the Holgersons' offer. Stern indicated to Ebright his agreement with the changes suggested in the letter.

On December 19, 1968, the Holgersons and Aerojet entered into an Agreement Surviving Escrow which provided for payments to be made as set forth in subparagraph 1(b) of the Holgersons' offer as amended by the Aerojet letter of November 25, 1968. Such Agreement Surviving Escrow read, in part, as follows:

In this connection, Buyer agrees on February 1, 1969, and on the first day of each and every month thereafter, up to and including December 1, 1969, to deposit the sum of $15,000.00 in an interest bearing account at the bank designated in paragraph 3 below, subject to the following conditions:

a. During the period beginning February 1, 1969, and ending December 31, 1970, the Buyer may withdraw, subject to written approval of the Seller, all or any part of such payments, including any interest earned by such account, for the sole purpose of making capital improvements upon the property to satisfy the requirements of a tenant or tenants of the Buyer who have requested, in writing, capital improvements as part of their transaction with the Buyer.

b. On January 1, 1971, the Seller shall have the unrestricted right to withdraw any of the remaining funds with accrued interest from said interest bearing account and the amount of the $2,650,000.00 promissory note shall be credited on the date of withdrawal with the amount withdrawn, excepting any interest earned by such account and not previously withdrawn by the Buyer, shall be retained by the Seller without credit to the principal and interest of said promissory note.

On December 18, 1968, the Holgersons executed a promissory note in favor of Aerojet with payments of principal and interest

to be made as set forth in subparagraphs 1(c), (d), (e), (f), and (g) of their November 23, 1968, offer, as modified by the Aerojet letter of November 25, 1968. Such promissory note also included the following provisions:

A. *Principal:*

Principal shall be payable in monthly installments on the following dates:

1. Commencing on January 1, 1970, and continuing on the first day of each month thereafter to and including December 1, 1971, the sum of TEN THOUSAND AND 00/100 DOLLARS ($10,000.00), plus the further monthly sum equal to fifty per cent (50%) of all gross rentals derived from the real property, including the buildings and improvements located thereon, described in the Deed of Trust securing this Note and hereinafter mentioned, excluding, however, an amount equal to the gross rents not exceeding the amount of TWENTY-SEVEN THOUSAND TWENTY-THREE AND 74/100 DOLLARS ($27,023.74) per month derived from that certain Lease, as amended (hereinafter called "State of California Lease") dated November 16, 1965, between AEROJET-GENERAL CORPORATION, payee above named, as Lessor, and State of California, as Lessee, covering a portion of the building or buildings located on the aforementioned real property.

2. Commencing on January 1, 1972, and continuing on the first day of each month thereafter to and including December 1, 1974, the greater of the following sums each month during said 24 months period, namely, (a) the sum of FIFTEEN THOUSAND AND 00/100 DOLLARS ($15,000.00), or (b) the sum of TEN THOUSAND AND 00/100 DOLLARS ($10,000.00), plus the further monthly sum equal to fifty per cent (50%) of all gross rentals derived from the aforesaid real property, including the building and improvements located thereon described in said Deed of Trust, excluding, however, an amount equal to the gross rents not exceeding the amount of TWENTY-SEVEN THOUSAND TWENTY-THREE AND 74/100 DOLLARS ($27,023.74) per month derived from said State of California Lease.

3. Commencing on January 1, 1975 and continuing on the first day of each month thereafter to and including December 1, 1978, the greater of the following sums each month during said 36 months period, namely, (a) the sum of TWENTY THOUSAND AND 00/100 DOLLARS ($20,000.00), or (b) the sum of TEN THOUSAND AND 00/100 DOLLARS ($10,000.00), plus the further monthly sum equal to fifty per cent (50%) of all gross rentals derived from the aforesaid real property, including the building and improvements located thereon described in said Deed of Trust, excluding, however, an amount equal to the gross rents not exceeding the sum of TWENTY-SEVEN THOUSAND TWENTY THREE AND 74/100 DOLLARS ($27,023.74) per month derived from said State of California Lease.

\* \* \* \* \* \* \*

Interest at the rate of seven per cent (7%) per annum on unpaid principal from date of closing to and including December 31, 1971, shall be paid in advance on or before May 1, 1969. Such interest shall be based on unpaid principal as reduced by payment of regular monthly principal installments [of $10,000 per month] \* \* \* to be made in discharge of unpaid principal. In the

event of payment of principal derived from rental installments payable [$10,000 plus 50% of gross rentals] * * * or by reason of principal prepayments, the makers hereof shall be entitled to be credited accordingly based upon prepayments of interest computed upon principal which has not taken into account reduction in principal arising out of payment of rental installments or principal prepayments.

*    *    *    *    *    *    *

2. *Principal.*
The undersigned hereby further reserve the right to prepay, without bonus or prepayment charge, the whole or any part of the principal amount of this Note at any time during the term hereof.

On December 19, 1968, the Holgersons executed a deed of trust of City Annex to Western Title Insurance Co. as trustee with Aerojet as beneficiary.

On December 20, 1968, escrow as to Aerojet's sale of the City Annex property was closed. At such closing the December 18, 1968, promissory note executed by the Holgersons was delivered to Aerojet. At that same time $400,000 was paid to Aerojet and designated as prepaid interest on the December 18, 1968, note. Of such amount, $300,000 was paid by the Holgersons, $50,000 by Paul F. Roemer, Jr. (Roemer), and $50,000 by Robert S. Brickell (Brickell). On May 1, 1969, $156,500 was paid to Aerojet and designated as prepaid interest. Of such amount, $145,200 was paid by the Holgersons, $5,650 by Roemer, and $5,650 by Brickell.

The Holgersons purchased City Annex on behalf of Roemer, Brickell, and themselves. During the last week of April 1969, the Holgersons, Roemer, and Brickell entered into an agreement with the Western Title Insurance Co. providing that the Holgersons have an 80-percent undivided interest, Roemer a 12-percent undivided interest, and Brickell an 8-percent undivided interest in City Annex. Such agreement provided further:

Eighty percent (80%) of the down payment, including prepaid interest on the purchase price and closing costs on the property, shall be contributed by the Holgersons, ten percent (10%) thereof shall be contributed by Roemer, and ten percent (10%) thereof shall be contributed by Brickell. * * *

Such agreement specifically stated that the Holgersons, Roemer, and Brickell were not partners.

In addition to the prepaid interest, payments of interest and principal were made on the December 18, 1968, note by the Holgersons, Roemer, and Brickell as follows:

| Year | Interest | Principal |
|------|----------|-----------|
| 1969 | | |
| 1970 | | $156,083.95 |
| 1971 | | 276,984.79 |
| 1972 | $133,034.50 | 151,320.14 |
| 1973 | 156,887.86 | 90,000.00 |
| 1974 | 146,812.88 | 180,135.85 |
| 1975 | 134,499.08 | 240,000.00 |
| 1976 (through Nov. 30) | 106,734.80 | 220,000.00 |

Partnership returns were filed by the Holgersons, Roemer, and Brickell for 1968 and 1969 with respect to the operation of City Annex which showed net losses of $377,802 in 1968 and $136,013 in 1969. These returns were prepared on the cash method and included deductions of $400,000 for interest in 1968 and $156,500 in 1969. The Holgersons, Roemer, and Brickell deducted their shares of the City Annex losses on their individual returns as follows:

| | 1968 | 1969 |
|------|------|------|
| Holgersons | $282,242 | $128,810 |
| Roemer | 47,335 | 3,192 |
| Brickell | 48,225 | 4,011 |

In his notices of deficiency, respondent treated the $400,000 designated as prepaid interest in 1968 and the $146,500 designated as prepaid interest in 1969 to be deductible only to the extent of $5,560 in 1968 and $185,500 in 1969.

### 3. Pine Terrace

On December 21, 1967, Holgerson entered into an agreement to purchase property known as Pine Terrace from the Duffel-Smoot Cos. (Duffel-Smoot) for $1 million. Under the December 21, 1967, agreement, Holgerson was to assume an existing first mortgage of approximately $650,000 and execute a $350,000 note in favor of the seller and secured by a second deed of trust with interest at 8 percent and a term of 10 years. The terms of such note were to provide that Holgerson prepay $210,000 as 7½ years' interest, that principal payments on the note would not begin for 7½ years, and that the note might be paid in full by

Holgerson at the end of 7½ years at the discounted amount of $275,000.

On December 27, 1967, the Holgersons executed a note for $274,759.03 with interest from December 31, 1967, at 8 percent per annum, and principal and interest payable in $3,000 installments on the first day of each month beginning October 31, 1974, until December 31, 1977, on which date the unpaid principal and interest thereon would become due and payable, except if the note were paid on or before October 31, 1974, $199,759.03 would be payment in full. During September 1974, the Holgersons paid Duffel-Smoot $199,759.03.

On December 29, 1967, escrow was closed and the Holgersons paid the purchase price by assuming a first mortgage of $655,240.97, transferring their note for $274,759.03, and paying $70,000 in cash. At the close of escrow, the Holgersons also paid to Duffel-Smoot $150,201.52 designated as prepaid interest on the December 27, 1967, note for the period up to October 31, 1974. Such amount was deducted by the Holgersons in their joint return for the taxable year 1967, and respondent disallowed the entire deduction in his statutory notice.

### 4. *Royal Ann*

On September 2, 1967, Oaks Investment Co. (Oaks), a partnership, entered into a contract of sale with Prospect Hill Building Co. (Prospect Hill), a corporation, to sell property known as Royal Ann Apartments, which it then owned, for $435,000. On April 30, 1968, a partner of Oaks, wrote to Prospect Hill that the sales contract on the Royal Ann Apartments had been broken because of nonpayment of certain specified items and that it would consider a new sales contract at a later date.

On September 10, 1968, the Holgersons executed a note in favor of Regal Servi-Center, Inc. (Regal), in the face amount of $160,000 ($160,000 note) with interest from September 13, 1968, on the unpaid principal at the rate of 8½ percent per year, payable in advance to September 13, 1976. Such note also provided that principal and interest were payable in monthly installments of $2,534.40 or more on the 13th of each month beginning October 13, 1976, but such note might be satisfied in full by payment of $104,000 on or before September 13, 1976. Such note was due in its entirety on or before September 10, 1983. To secure such note, the Holgersons also executed on

September 10, 1968, a deed of trust to the Royal Ann Apartments.

On September 10, 1968, Duncan Hole (Hole) executed a note ($60,000 note) on behalf of Regal payable to Oaks in the amount of $60,000 with interest on the unpaid amount from September 10, 1968, at a rate of 8 percent per year. The $60,000 note also provided for monthly installments of $600 or more beginning October 15, 1968.

On September 13, 1968, Regal assigned to Oaks its rights in the $160,000 note and its rights under the deed of trust relating to the Royal Ann Apartments to the extent of $60,000 with the provision that such note and deed of trust be reassigned upon payment in full of the $60,000 note.

On September 13, 1968, the escrow relating to the Holgersons' purchase of the Royal Ann Apartments was closed. The stated purchase price of $465,000 which Oaks received consisted of the Holgersons' assumption of an outstanding loan on the Royal Ann Apartments in the amount of $256,980.90, the $60,000 note from Regal and the remainder, less costs of the transaction, in cash. The Holgersons deposited $152,011.13 into the escrow relating to their purchase of the Royal Ann Apartments. Such amount was disbursed as follows:

| | |
|---|---:|
| Assumption fee | $20.00 |
| To Regal | 8,800.00 |
| Recording fees | 4.80 |
| Title insurance fee | 1,572.50 |
| Preparing documents | 20.00 |
| Commission (less credits) | 15,039.55 |
| U.S. revenue stamps | 229.90 |
| To Oaks | 126,324.38 |
| Total | 152,011.13 |

The remaining $100,000 of the $108,800 amount credited to Regal and designated as prepaid interest on the $160,000 note was withheld from the proceeds of such note.

During September of 1969, Regal transferred the $160,000 note to Oaks in satisfaction of its obligation under the $60,000 note. Before September 13, 1976, the Holgersons paid $104,000 to Oaks in satisfaction of their obligation under the $160,000 note.

On their 1968 return, the Holgersons deducted $108,800 as

interest prepaid on the $160,000 note. In his notice of deficiency, respondent disallowed such deduction in full.

### 5. *Riverside Motelodge*

On April 13, 1963, Maurice Weiss and Edna Weiss, his wife (the Weisses), who owned certain land situated in Riverside, Calif., entered into a lease of such property for 53 years commencing March 1, 1963, with Western Motorlodge (Western). Western contemplated constructing and operating a motel, restaurant, and possibly a cocktail lounge on such property. Such lease provided, in part, as follows:

9. *Assignment*
Lessee may assign this Lease, or any interest therein, or any right or privilege appurtenant thereto, under the following provisions:
(a) The Assignee shall be able to show a net worth, as the term is recognized by Certified Public Accountants in California, in the sum of at least TWO HUNDRED THOUSAND DOLLARS ($200,000.00).
(b) Such Assignee shall, in writing, expressly agree that any such assignment shall be subject to all of the terms of this Lease, and that such Assignee shall add, in writing, for the benefit of Lessors, a covenant to comply with all of the terms of this lease.

Paragraph 9 was not affected by an addendum to the April 13, 1963, lease which was executed on May 10, 1963. Prior to September 1, 1968, Western had built a motel facility on the leased property (hereinafter referred to as Riverside Motelodge).

On September 1, 1968, Holgerson entered into an agreement with Western to purchase Western's leasehold interest in the Riverside Motelodge, together with certain personal property, for a total consideration of $700,000 consisting of the Holgersons' taking subject to, or assuming, the existing loan of $305,000 to which Western's leasehold interest was subject, a cash downpayment of $35,000, and Holgerson's $360,000 note. The September 1, 1968, agreement also provided for Holgerson to pay $216,000 cash as prepaid interest on the $360,000 note and for Western to lease back Riverside Motelodge. The September 1, 1968, agreement was subject to the execution of such leaseback in a form satisfactory to Holgerson and his attorney and the written approval of Western's financial responsibility by Holgerson and his attorney.

On November 25, 1968, Western executed an assignment of the April 13, 1963, lease to Holgerson. Also on November 25,

1968, Holgerson leased his Riverside Motelodge interest back to Western for a term of 15 years commencing December 1, 1968.

On December 19, 1968, the Weisses certified by document that they owned fee title to the Riverside Motelodge, the rent on the April 13, 1963, lease had been paid up to and including December 31, 1968, and they had not declared a default of any term of that lease. In such document, they also consented to and approved the assignment of the April 13, 1963, lease to Holgerson on the condition that he sign an agreement (1) accepting the assignment of such lease subject to all the terms and conditions of the lease, (2) assuming liability for future rents under the lease, (3) agreeing to comply with each and every one of the terms and conditions of the lease, and (4) assuming the indebtedness to which the property was subject and holding the Weisses harmless from such indebtedness.

On December 20, 1968, the Riverside Motelodge transaction was closed. At such time, Holgerson took the Riverside Motelodge leasehold interest subject to an existing deed of trust in the amount of $305,000, paid $35,000 cash to Western, and transferred to Western his note dated November 25, 1968, in the amount of $360,000 secured by a second deed of trust. The terms of the $360,000 note was 15 years with interest on said note's anniversary date at the rate of 12 percent per annum for the first 5 years and thereafter at a rate of 7 percent per annum until the principal amount was paid in full. Such note also required the prepayment of 2½ years' interest on the date of the note and prepayment of interest for the next 2½ years on or before January 2, 1969. By its terms, such note could be satisfied at any time within 5 years from its date of execution by a payment of $165,000 plus all accrued interest. By 1972, Holgerson had paid $165,000 on the principal of such note.

On November 25, 1968, Holgerson deposited into escrow an amount including $90,500 which was transferred to Western upon closing and designated as prepaid interest on his note. On December 27, 1968, Holgerson paid to Western $500 designated as prepaid interest on his note. On January 2, 1969, Holgerson paid to Western $125,000 designated as prepaid interest on his note. Holgerson deducted such amounts designated as prepaid interest on his Federal tax returns for the years 1968 and 1969.

In his statutory notice, respondent disallowed such deductions in full.[3]

## OPINION

### 1. *Walgro*

The Holgersons argue that Rev. Rul. 68-643, 1968-2 C.B. 76,[4]

---

[3]While respondent disallowed $91,208 as an interest deduction for 1968 with respect to the Riverside Motelodge transactions, Holgerson in his brief only claims that he is entitled to a deduction of $91,000. It is unclear for what the additional $208 was deducted.

[4]"Reconsideration has been given to I.T. 3740, C.B. 1945, 109, concerning the question whether interest paid in advance is deductible for Federal income tax purposes for the year in which paid.

"I.T. 3740 was based upon a transaction in which the taxpayer paid interest in advance for a period of five years. As to such transaction, I.T. 3740 holds that where a taxpayer keeps books of account and files Federal income tax returns on the cash receipts and disbursements method of accounting, interest paid in advance for a period of 5 years is deductible for the year in which paid, but where the accrual method of accounting is used in reporting income, interest is deductible for the year in which the liability to pay accrues irrespective of when payment is actually made.

"Section 163 of the Internal Revenue Code of 1954 provides, in general, that there shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

"Section 446(a) of the Code provides that taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. Section 446(b) of the Code provides, in part, that if the method used does not clearly reflect income the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

"As to taxpayers employing the accrual method of accounting, consistent with the position stated in I.T. 3740, interest accrues ratably over the period of the loan and is allowable as a deduction ratably over this period, irrespective of when paid.

"In view of certain abuses which have arisen with respect to prepayment of interest by taxpayers using the cash receipts and disbursements method of accounting, the Service has reexamined its position in I.T. 3740. The Service now concludes that the deduction of prepaid interest in the year of payment by a taxpayer employing the cash receipts and disbursements method of accounting may not result in a clear reflection of income for the taxable year of payment. A deduction for interest paid in advance on each indebtedness for a period not in excess of 12 months of the taxable year immediately following the taxable year in which the prepayment is made will be considered on a case by case basis to determine whether a material distortion of income has resulted. Some of the factors to be considered in determining whether the deduction of prepaid interest gives rise to a material distortion of income include but are not limited to the amount of income in the taxable year of payment, the income of previous taxable years, the amount of prepaid interest, the time of payment, the reason of prepayment, and the existence of a varying rate of interest over the term of the loan. If interest is prepaid for a period extending more than 12 months beyond the end of the current taxable year, the deduction of such prepaid interest in the taxable year of payment will be considered as materially distorting income. Where a material distortion of income has been found to result from the deduction of prepaid interest, the Service will require the taxpayer to change his method of accounting with respect to such prepaid interest in order to allocate it over the taxable years involved.

"In view of the foregoing, I.T. 3740 is revoked. However, pursuant to the authority contained in section 7805(b) of the Code, this Revenue Ruling will be applied without retroactive effect to interest prepayments for periods not in excess of five years made prior to November 26, 1968 by taxpayers employing the cash receipts and disbursements method of accounting. This Revenue Ruling also will be applied without retroactive effect to an interest prepayment for a period not in excess of five years made on or after November 26, 1968, by a taypayer employing the cash receipts and disbursements method of accounting, pursuant to a legal obligation incurred prior to such date to make such prepayment.

"The Service will no longer follow the contrary decisions in *John D. Fackler v. Commissioner*, 39

is not applicable to their $250,000 interest prepayment in the Walgro transaction, because Rev. Rul. 68–643 specifically provides that it will be applied without retroactive effect, pursuant to the authority contained in section 7805(b),[5] "to interest prepayments for periods not in excess of five years made prior to November 26, 1968, by taxpayers employing the cash receipts and disbursements method of accounting." The $250,000 prepayment made by the Holgersons was only sufficient to meet their interest obligations on the December 13, 1967, note for approximately 3⅔ years. However, the Holgersons agreed with Walgro that such amount could be applied, at the sole discretion of Walgro, to satisfy the Holgersons' interest obligation on such note for *any* 3⅔ years prior to February 1, 1976.

Respondent argues that the interest prepayment must satisfy obligations arising during a period not in excess of 5 years from the prepayment date in order for the limitation on retroactivity of Rev. Rul. 68–643 to apply. We agree. We believe that such limitation on retroactivity was designed to protect those taxpayers who had relied on I.T. 3740, 1945 C.B. 109,[6] from adverse tax consequences. Such ruling provided that "interest paid *in advance for a period of five years* constitutes an allowable deduction for Federal income tax purposes for the year in which paid." (Emphasis supplied.) We believe the emphasis of I.T. 3740, is as much on the length of the period between date of prepayment and the date on which the prepaid interest is actually earned as it is on the number of years' interest that can be satisifed with the prepaid funds. The length of time by which a deduction is taken before the interest is to be earned is as much directly related to the extent of tax deferral and distortion

---

B.T.A. 395 (1939), acquiescence, C.B. 1939–1 (Part I), 11, and *Court Holding Co. v. Commissioner*, 2 T.C. 531 (1943), acquiescence, C.B. 1943, 5. Acquiescence in each of those court decisions is being withdrawn and nonacquiescence substituted therefor. * * * "

[5] SEC. 7805. RULES AND REGULATIONS.

(b) Retroactivity of Regulations or Rulings.—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

[6] 26 C.F.R. sec. 601.601(d)(2)(v)(c) (1977), reads, in part, as follows:

"Where Revenue Rulings revoke or modify rulings previously published in the Bulletin the authority of section 7805(b) of the Code ordinarily is invoked to provide that the new rulings will not be applied retroactively to the extent that the new rulings have adverse tax consequences to taxpayers. * * * "

of income which occurs as is the number of years' interest that can be satisfied with the prepaid funds.[7] If this were not so, a debtor could in successive years prepay interest in 5-year increments succeeding one after the other into the distant future.

In the instant case Walgro applied the $250,000 interest prepayment to satisfy the Holgersons' interest obligations for part of 1973 and all of 1974 through 1976, so that none of such prepayment was applied to satisfy interest obligations arising during the taxable year in which such prepayment was made or the 5 taxable years thereafter. Accordingly, we hold that the limitation on the retroactivity of Rev. Rul. 68–643 is not applicable to such prepayment of interest and without deciding the validity of Rev. Rul. 68–643 in all cases,[8] we hold that the Holgersons have not met their burden of overcoming respondent's determination[9] that their treatment of prepaid interest fails to clearly reflect income. *Cole v. Commissioner*, 64 T.C. 1091 (1975). This payment is one of several substantial prepayments of interest which the Holgersons made at the end of a taxable year when their income from the sale of airplane parts had substantially increased, the Holgersons have not shown that such prepayment was required in order to reach an agreement with Walgro, and while the Holgersons deducted the entire amount of the prepayment in 1967, none of such amount was *actually applied* to satisfy interest accruing in 1967, and only

---

[7]We note that such theory is supported by that portion of Rev. Rul. 68–643, 1968–2 C.B. 76–77, which states:

"A deduction for interest paid *in advance* on each indebtedness for *a period not in excess of 12 months of the taxable year immediately following the taxable year in which the prepayment is made* will be considered on a case by case basis to determine whether a material distortion of income has resulted. * * * If interest is prepaid for a period *extending more than 12 months beyond the end of the current taxable year*, the deduction of such prepaid interest in the taxable year of payment will be considered as materially distorting income. * * * [Emphasis supplied.]"

[8]We have consistently declined to decide whether everything said in such ruling is valid or whether such ruling may be validly applied in all cases to which it purports to apply. *Cole v. Commissioner*, 64 T.C. 1091 (1975); *Burck v. Commissioner*, 63 T.C. 556 (1975), affd. 533 F.2d 768 (2d Cir. 1976); *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976).

[9]On brief, respondent abandoned his contention that the prepayment should be deducted ratably (along with the annual interest payments which they began to make in 1968) over the term of the note at 5.7732 percent (the average of the 7- and 4½-percent rates to be paid under the note). Respondent now takes the position that the interest rates should not be averaged and contends that the $250,000 amount of prepaid interest should be allocated and deducted, together with the annual interest payments made by the Holgersons to the sellers, at a rate of seven percent of the unpaid balance as specified in the note. Under such approach, for the years in issue the Holgersons will be allowed to deduct $3,350.27 ($\frac{18}{366}$ of 7 percent) in 1967, and $68,122.22 in both 1968 and 1969.

$3,350.27 ($18/366$ x 7 percent x $973,174.50) *could have been so applied.*

## 2. *City Annex*

Petitioners maintain that Rev. Rul. 68–643, *supra*, is inapplicable to the interest prepayments[10] which they made with respect to the City Annex transaction by paying $400,000 on December 20, 1968, and $156,500 on May 1, 1969, because such prepayment was made (1) by a cash method taxpayer (2) for a period not in excess of 5 years (3) pursuant to a legal obligation, incurred prior to November 26, 1968, to make such prepayment. Respondent argues that petitioners have not met either of the latter two of such requirements. We hold that the interest prepayment in question does not meet the requirements of the clause limiting retroactive application of Rev. Rul. 68–643, because it was made for a period in excess of 5 years. Therefore, we do not reach the question of whether such prepayment was made pursuant to a legal obligation, incurred prior to November 26, 1968, to make such prepayment.

In the City Annex transaction, petitioners prepaid interest in an amount equal to approximately 3 years' interest at 7 percent per annum on a principal amount of $2,650,000. However, there were various provisions in the promissory note and Agreement Surviving Escrow under which petitioners could (and to some extent were required to) reduce the principal amount of such note during the 3-year period following its execution. Of course, to the extent that the principal was reduced by credits, required payments, and optional prepayments, the interest accruing during the first 3-year period would also be reduced and the amount of interest prepaid by petitioners could be sufficient (especially if there were principal prepayments) to satisfy interest accruing for a period in excess of 5 years. Therefore, we hold that such prepayment was made for an indefinite period, and although it may be that such indefinite period might not, and did not in fact, exceed a period of 5 years, we do not believe the language regarding retroactivity of Rev. Rul. 68–643, was intended to

---

[10]Even though the prepayment of interest was made in two installments, we treat the two installments as *one* prepayment of interest for purposes of Rev. Rul. 68–643, 1968–2 C.B. 76, because they were both made pursuant to the Dec. 18, 1968, note which required that interest "shall be paid in advance on or before May 1, 1969." The parties have not argued that the installment should be treated separately for purposes of Rev. Rul. 68–643.

include prepayments for indefinite periods where there is at least a probability that they may extend beyond 5 years. A narrow interpretation of the language in Rev. Rul. 68–643, limiting its retroactivity is supported by the language of section 7805(b)[11] as well as by 26 C.F.R. sec. 601.601(d)(2)(v)(c)(1977), which states:

> (c) Revenue Rulings, other than those relating to the qualification of pension, annuity, profitsharing, stock bonus, and bond purchase plans, apply retroactively unless the Revenue Ruling includes a specific statement indicating, under the authority of section 7805(b) of the Internal Revenue Code of 1954, the extent to which it is to be applied without retroactive effect. Where Revenue Rulings revoke or modify rulings previously published in the Bulletin the authority of section 7805(b) of the Code ordinarily is invoked to provide that the new rulings will not be applied retroactively to the extent that the new rulings have adverse tax consequences to taxpayers. Section 7805(b) of the Code provides that the Secretary of the Treasury or his delegate may prescribe the extent to which any ruling is to be applied without retroactive effect. The exercise of this authority requires an affirmative action. * * *

and by *Matson Navigation Co. v. Commissioner*, 68 T.C. 847, 852 (1977), in which we stated as follows:

> We agree with the Commissioner that pursuant to section 7805(b) revenue rulings, which interpret statutory provisions, are generally retroactive, and that affirmative action on his part is required to make such rulings nonretroactive.

Moreover, even if the language limiting retroactivity of Rev. Rul. 68–643 were read so broadly as to cover the prepayment at issue, I.T. 3740 would still not be applicable to such prepayment unless it were for a period not in excess of 5 years. We cannot read I.T. 3740 so broadly as to cover a prepayment for an indefinite period which may possibly extend beyond 5 years. 26 C.F.R. sec. 601.601(d)(2)(v)(e) states:

> (e) Taxpayers generally may rely upon Revenue Rulings published in the Bulletin in determining the tax treatment of their own transactions and need not request specific rulings applying the principles of a published Revenue Ruling to the facts of their particular cases. *However, since each Revenue Ruling represents the conclusion of the Service as to the application of the law to the entire state of facts involved, taxpayers, Service personnel, and others concerned are cautioned against reaching the same conclusion in other cases*

---

[11](b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

*unless the facts and circumstances are substantially the same.* * * * [Emphasis supplied.]

Accordingly, we hold that Rev. Rul. 68–643 is applicable to the interest prepayment made by petitioners in connection with the City Annex transaction, and, without approving the application of Rev. Rul. 68–643 to all situations within its scope, we hold that petitioners have not met their burden of overcoming respondent's determination that their treatment of prepaid interest fails to clearly reflect income. *Cole v. Commissioner, supra.* Petitioners made the $400,000 prepayment installment near the end of the taxable year 1968, and deducted the entire amount of such prepayment although interest equaling only $5,575.14, or approximately 3 percent of the prepayment, was earned during the taxable year, and petitioners deducted the entire $156,500 prepayment installment made in 1969 although none of such amount was necessary to satisfy interest obligations arising during 1969 because of the prior $400,000 prepayment.[12] Moreover, it has not been shown that any prepayment was necessary to reach an agreement for petitioners' purchase of the City Annex property. We hold that the interest prepayment must be deducted pro rata over the years during which it is earned.

Petitioners' argument that Rev. Rul. 68–643 is applicable only to that portion of their prepayment which prepaid interest for a period commencing more than 5 years from the date of prepayment is without merit. Petitioners cite no cases in support of such position and we have found none. Moreover, there is nothing in the language of Rev. Rul. 68–643 or I.T. 3740 supporting their position. I.T. 3740 was merely a statement of an administrative position that the current deduction of interest prepayments for a period which *in its entirety* did not exceed 5 years would not be challenged. It is clear that the longer the prepayment period, then the greater is the possibility that income will be distorted and that tax avoidance motives are present. As stated *supra* at page 454 the language limiting

---

[12] We note that petitioners made a larger prepayment on May 1, 1969, than required. The Dec. 18, 1968, note required a 1969 prepayment which, together with the prior $400,000 prepayment, was sufficient to satisfy interest at a rate of 7 percent from the date of closing to Dec. 31, 1971, based on the principal amount *as reduced by the required minimum principal payments.* However, petitioners' prepayments were in an amount computed as 3 years' interest at 7 percent on an *unreduced* principal amount of $2,650,000.

retroactivity of Rev. Rul. 68–643 was designed to protect taxpayers from adverse tax consequences to the extent that they had relied on I.T. 3740 so that retroactivity should be limited, if the other conditions limiting retroactivity are met, only where the interest prepayment as a whole is for a period not in excess of 5 years.

## 3. *Pine Terrace*

Respondent argues that in substance the principal amount of the December 27, 1967, note was equal to the stated principal amount less the discount for prepayment, or $199,759.03, so that the Holgersons' basis of Pine Terrace should be decreased accordingly, and so that a portion of the amount designated as prepaid interest on $274,759.03 was in fact part of the purchase price, not interest.

Under section 1012, the Holgersons' basis of the Pine Terrace property is "the amount paid for such property in cash or other property." Sec. 1.1012–1(a), Income Tax Regs. It is clear that a purchase-money debt obligation, such as the Holgersons' note, for part of the purchase price will be included in basis. *Mayerson v. Commissioner*, 47 T.C. 340 (1966). However, we must determine the amount which the Holgersons were obligated to pay in substance since this is the proper amount to include in their basis of Pine Terrace. *Gregory v. Helvering*, 293 U.S. 465 (1935).

The Holgersons could fully satisfy their obligations under the note (1) by a principal payment of $199,759.03 on or before October 31, 1974, or (2) by a principal payment of $274,759.03, less the amount of prior principal payments, on or before December 31, 1977. *Mayerson v. Commissioner, supra,* involved a note for a term of 99 years with a stated principal amount of $332,500 providing that if the required principal payments totaling $10,000 and all interest due had been paid, such note could be satisfied in full by a payment of $275,000 within the first year and by a payment of $298,750 within the second year of the note's term. In *Mayerson* we stated (47 T.C. at 354):

There were only two variables in the overall purchase price of the property, and they were specified in dollar amounts. The price depended then upon whether the purchase-money mortgage was paid within the first year, the second year, or years thereafter. We would classify such a price reduction for early payment as a bonus discount. The presence of such optional discounts

does not make the purchase price indefinite. *It merely provided an incentive for very early retirement of the mortgage which did not occur.* The cost basis at the time of purchase should be the nondiscount price; the entire principal of the note and mortgage was due unless the discounted sums were paid in the first 2 years. It was not prepaid so as to provide for the application of the discount provisions and hence no adjustment in basis is required during the years before us. * * * [Emphasis supplied.]

We believe the instant case is distinguishable from *Mayerson* because (1) the discount provided in the Holgersons' note cannot be fairly classified as a discount for early payment, and (2) the Holgersons did in fact satisfy their note for the discounted amount, and at the time of purchase there was not a substantial possibility that they would ever pay the stated principal amount of $274,759.03 in full. In *Mayerson,* the discount was available only for payment during the first 2 years of a note for a term of 99 years, and the amount of the available discount was approximately 15 percent for payment during the first year and approximately 7 percent for payment during the second year of the note's term. By contrast, the Holgersons could receive a discount of over 27 percent for payment at any time during the first 6 years and 10 months of a note for a term of only 10 years. Since the terms of such discount were so favorable, we do not believe there was a substantial likelihood that payment would not be made within the first 6 years and 10 months of the note so as to receive such discount. Even if the Holgersons had to borrow in order to pay the note within such period, we believe that persons with their business acumen and contacts would be able to secure a second mortgage for $199,759.03 at an interest rate sufficiently low so that it would be profitable to take advantage of the available discount with such borrowed funds. In fact, the Holgersons did subsequently satisfy their obligations under the note by payment of the discounted amount. We cannot allow the Holgersons a cost basis at the time of purchase, including their note at the nondiscount price of $274,759.03, where there is not at least a substantial probability that such amount will ever be paid in full. To allow such inflated basis, would permit excessive depreciation deductions and tax deferral for as many as 6 years until the Holgersons satisfied their note for the discounted amount of $199,759.03 and their basis was decreased to reflect such fact. Accordingly, we find that the December 27, 1967, note should be included in the Holgersons' basis of Pine Terrace at the amount of $199,759.03.

For an amount to be deductible pursuant to section 163, it must have been paid on an existing, unconditional, and legally enforceable obligation. *Titcher v. Commissioner*, 57 T.C. 315 (1971); *Kovtun v. Commissioner*, 54 T.C. 331 (1970), affd. 448 F.2d 1268 (9th Cir. 1971). The Holgersons' obligation on their note was unconditional only to the extent of $199,759.03, (*Michelin Corp. v. McMahon*, 137 F. Supp. 798 (S.D.N.Y. 1956)), but the $150,201.52 prepayment was computed as interest for 6 years and 10 months at 8 percent per annum on a principal amount of $274,759.03. Moreover, we are not convinced that the favorable discount provisions on the December 27, 1967, note would have been included if it had not been for the fact that the Holgersons were making a large prepayment of interest. Thus, we believe that a portion of the $150,201.52 prepayment represented in reality a payment on the purchase price of Pine Terrace. Accordingly, we hold that only the portion of the $150,201.52 prepayment equaling $109,201.60 (computed as interest for 6 years and 10 months at a rate of 8 percent per annum on a principal amount of $199,759.03) represents interest paid on indebtedness for section 163 purposes and the remainder of the $150,201.52 is a payment on the purchase price of Pine Terrace and the Holgersons' basis of Pine Terrace should be adjusted accordingly.

In any event, the amount which does represent prepaid interest is not deductible in the year of payment because such deduction would materially distort the Holgersons' income. I.T. 3740, 1945 C.B. 109, is inapplicable because the prepayment exceeds 5 years and we hold that deducting the entire amount of such prepayment in 1967 would materially distort the Holgersons' income since it was paid at the end of a year in which the Holgersons' income had substantially increased over past years, very little interest was actually earned in the year of payment, and there is no evidence that prepaid interest was required to reach an agreement with respect to the purchase of Pine Terrace. Accordingly, we hold that the $109,201.60 amount must be deducted pro rata over the years for which it was paid.

### 4. *Royal Ann*

Respondent first argues that the Holgersons only "paid" $8,800 during 1968 for section 163(a) purposes[13] because the Holgersons only paid such amount in cash and the remaining $100,000 of the amount designated as prepaid interest was withheld from the proceeds of the $160,000 note. It is well established that a cash basis borrower has not paid interest when the lender withholds as interest a certain sum from the face amount of the loan and only makes available the proceeds in excess of the interest obligation as was done by Regal in the instant case. *Rubnitz v. Commissioner*, 67 T.C. 621, 628 (1977), and cases cited therein. Moreover, even if the entire proceeds of the $160,000 note had been deposited in the escrow relating to the Holgersons' purchase of the Royal Ann Apartments, the Holgersons would still not have had unrestricted control over the proceeds, and a "prearranged retransfer of funds" to Regal would not have constituted a "payment" which a cash basis taxpayer could deduct. *Rubnitz v. Commissioner, supra* at 629. Accordingly, for section 163(a) purposes we hold that petitioner "paid" only $8,800 to Regal during 1968.[14]

Respondent argues that none of the $108,800 payment is deductible as interest by the Holgersons in any year because the transaction was a sham designed solely for the purpose of obtaining an interest deduction. We disagree. The Holgersons stood to benefit from the $160,000 debt because it enabled them to purchase the Royal Ann Apartments and, aside from tax benefits, they could realistically anticipate to profit from such transaction. These facts distinguish the instant case from *Goldstein v. Commissioner*, 44 T.C. 284 (1965), affd. 364 F.2d 734 (2d Cir. 1966).

Respondent argues next that, assuming the reality of the indebtedness, there was no substance in Regal's role as lender

---

[13]SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

[14]We do not believe this conclusion is inconsistent with the parties' stipulation stating:

"The $108,800.00 paid at the closing of the Holgersons' purchase of the Royal Ann Apartments to Regal Servi-Center, Inc., designated as prepaid interest, was deducted by the Holgersons on their 1968 return as interest."

We interpret the term "paid" as used in such stipulation to have a broader meaning than the technical one which it has for sec. 163(a) purposes.

and that the "real" lender was Oaks. Such argument misses the point.

In *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), the Second Circuit Court of Appeals, in holding that the *indebtedness* on which interest is paid must be incurred in order to engage in some purposive activity, did not apply a purposive test to the interest that was paid on such indebtedness. The court stated (364 F.2d at 741):

there is no requirement that deductible interest serve a business purpose, that it be ordinary and necessary, or even that it be reasonable. 4 Mertens, Law of Federal Income Taxation §26.01 (1960 ed.). * * *

Section 163(a) should be construed to permit the deductibility of interest when a taxpayer has borrowed funds and incurred an obligation to pay interest in order to engage in what with reason can be termed purposive activity, even though he decided to borrow in order to gain an interest deduction rather than to finance the activity in some other way. In other words, the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds; or, put a third way, the deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction. * * *

Even if Oaks were the "real" lender, the fundamental facts remain that the Holgersons were obligated under the $160,000 note; they paid the principal amount, according to the terms of such note, to Oaks as assignee; the indebtedness was incurred so that the Holgersons could purchase and take possession of the Royal Ann Apartments; and the $8,800 was paid for the use and forbearance of money.[15]

The $108,800 amount designated as prepaid interest was computed as 8 years' interest at 8 percent per annum on a principal amount of $160,000. As was the case in Pine Terrace, *supra,* the Holgersons' indebtedness to Regal was unconditional only to the extent of $104,000. *Michelin Corp. v. McMahan, supra.*

However, we need not decide whether the $108,800 amount represented interest only to the extent of $70,720 equaling 8-years' interest at 8½ percent per annum on the $104,000

---

[15] Of course if Oaks were the "real" lender, such fact might affect its tax liability for 1968 but Oaks is not a party to this proceeding. However, even if Oaks were the real lender the Holgersons' basis of the Royal Ann Apartments remains unchanged since only $60,000 of the proceeds from the Holgersons' note was applied to the purchase of the Royal Ann Apartments in any event with the remainder withheld and designated as prepaid interest.

principal amount for which the Holgersons were unconditionally obligated since the remaining $38,000 of the $108,800 amount as well as part of the $70,720 was never actually paid. The Holgersons satisfied their obligations in full by payment of $104,000 in 1976 (thereby repaying only $44,000 of the $100,000 which was withheld from the proceeds of the $160,000 note). Therefore, we hold that the entire $8,800 which was paid in 1968 represented interest.

Since the Holgersons only "paid" $8,800 as prepaid interest during 1968, and since such amount represented interest paid in advance for a period of less than 5 years, we hold that the entire $8,800 is deductible by the Holgersons in the year of payment pursuant to I.T. 3740.

## 5. *Riverside Motelodge*

In the Riverside Motelodge transaction, we are again faced with determining the value at which a note providing for alternative methods of payment is includable in the maker's basis in the purchased property and whether the entire amount designated as prepaid interest which was computed by applying the stated interest rate to the maximum principal amount is "interest paid * * * on indebtedness" for purposes of section 163.

The note which Holgerson executed on November 25, 1968, could be satisfied either by a principal payment of $165,000 before November 25, 1973, or a principal payment of $360,000 on or before November 25, 1983. The large amount of such discount and the long period for which it was available, indicate that it was not merely a discount for early payment so that *Mayerson v. Commissioner, supra,* is distinguishable. It would clearly have been in Holgerson's financial interest to obtain a loan, if necessary, in order to take advantage of the discount for early payment and we find it inconceivable that a person with his business acumen and financial contacts would not have been able to secure a loan with a rate of interest which would allow him to profitably take advantage of the discount. We find that there was no substantial possibility that he would pay the full $360,000 on such note. Of course, Holgerson did take advantage of the early payment discount during 1972. Accordingly, we find that the amount of the November 25, 1968, note was in fact

$165,000 and that it should be included in Holgerson's basis of the Riverside Motelodge leasehold interest at such amount.

Holgerson's obligation on the November 25, 1968, note was unconditional, as required for section 163 purposes, *Titcher v. Commissioner, supra,* only to the extent of $165,000, but the $216,000 amount of the interest prepayment was computed as 5 years' interest on $360,000 at a rate of 12 percent per annum. Since the amount of Holgerson's interest prepayment was greater than the amount of the discounted principal payment which would have satisfied the note in full, we conclude that Holgerson paid such larger amount only because the discount provisions would not be included in the November 25, 1968, note unless he agreed to make the $216,000 interest prepayment. Therefore, it follows that the prepayment was made, in part, to secure the advantageous discount provision rather than for the use or forbearance of money, and that part of the $216,000 payment was in reality a payment on the purchase price of the Riverside Motelodge leasehold interest. Accordingly, we hold that the $216,000 payment represented interest only to the extent of $99,000, equaling 5 years' interest at the rate of 12 percent on the principal amount of $165,000 which the Holgersons were unconditionally obligated to pay, and that the remaining $117,000[16] of such payment was a payment on the purchase price of the Riverside Motelodge leasehold interest, and Holgerson's basis should accordingly be so adjusted.

The parties agree that I.T. 3740, *supra,* is applicable to the $99,000 portion of the $216,000 amount which represents prepaid interest *if* the $216,000 was paid pursuant to a legal obligation incurred prior to November 26, 1968, to make such prepayment. Holgerson was bound to purchase the Riverside Motelodge leasehold interest (and to prepay $216,000) by the September 1, 1968, agreement and Western was bound to sell. It is irrelevant whether the leasehold interest had been effectively assigned prior to November 26, 1968. Western was bound to assign such interest, and although Holgerson may have been released from his obligation to prepay interest if Western was unable to assign it, he was, nevertheless, legally obligated as of September 1,

---

[16]The amounts representing interest and purchase price should be allocated equally among the installments paid on Nov. 25, 1968 ($90,500), Dec. 27, 1968 ($500), and Jan. 2, 1969 ($125,000).

1968, and the $216,000 payment was subsequently made pursuant to such obligation.[17]

Section 1.1201–1(f)(2)(i), Income Tax Regs., defines "binding contract," as follows:

(i) A binding contract entered into on or before October 9, 1969, means a contract, whether written or unwritten, which on or before that date was legally enforceable against the taxpayer under applicable law. If on or before October 9, 1969, a taxpayer grants an irrevocable option or irrevocable contractual right to another party to buy certain property and such other party exercises that option or right after October 9, 1969, the sale of such property is a sale pursuant to a binding contract entered into on or before October 9, 1969.
* * *

The language limiting retroactivity of Rev. Rul. 68–643 uses the term "legal obligation" rather than "binding contract" to make the distinction between a payment made pursuant to a binding contract entered into before November 26, 1968, which did not obligate the purchaser to make a prepayment of interest (Rev. Rul. 68–643 applies retroactively), and a binding contract entered into before November 26, 1968, under which the taxpayer had a "legal obligation" to prepay interest (no retroactive application). Since the September 1, 1968, agreement was a binding contract under which Holgerson was obligated to prepay interest, the instant case is distinguishable from *Cole v. Commissioner, supra,* and *Sander v. Commissioner,* 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976). Accordingly, we hold that I.T. 3740, *supra,* is applicable and that the $99,000 portion of the $216,000 amount which represents interest paid on indebtedness is deductible in the year of payment.

*Decisions will be entered under Rule 155.*

---

[17]Although the Sept. 1, 1968, agreement was expressly subject to the execution of a lease of the Riverside Motelodge leasehold interest back to Western in a form satisfactory to Holgerson and his attorney and to the written approval of Western's financial responsibility by Holgerson and his attorney, no issue has been raised with regard to the satisfaction of these conditions prior to Nov. 26, 1968.