ROSS R. SANBORN and CAROLINE C. SANBORN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Sanborn v. Commissioner
Docket Nos. 9236-75, 10102-75, 10103-75, 10104-75, 10105-75, 1277-78, 1278-78, 1279-78, 1280-78, 1281-78.
United States Tax Court
T.C. Memo 1983-579; 1983 Tax Ct. Memo LEXIS 209; 46 T.C.M. (CCH) 1435; T.C.M. (RIA) 83579; September 20, 1983. *209 W and H entered into a transaction in December 1967 which, in form, was a sale from W to H and a leaseback from H to W. Petitioner-husbands were the shareholders of W, a subchapter S corporation. Held: (1) The transaction is in substance a sale-leaseback, petitioners having failed to present "strong proof" that the transaction is a financing arrangement. Accordingly, W received interest income from H in W's fiscal year 1970. Held: (2) In applying the passive income test of section 1372(e)(5), I.R.C. 1954, W's fiscal year 1970 interest income is not netted against W's fiscal year 1970 rental payments to H. Held: (3) For W's fiscal year 1970, its passive investment income exceeded 20 percent of its gross receipts. W's subchapter S status terminated and its losses for its fiscal year 1970 and thereafter are not passed through to its shareholders. In January 1968, some of the properties leased by W and owned by H under the sale-leaseback were damaged by flooding. Held: (4) Petitioners have failed to meet their burden of proving that W is entitled to a casualty loss deduction for its fiscal year 1968 and thus, that they, as shareholders of a then subchapter S corporation, are entitled *210 to a pass-through deduction on account of the casualty loss. The Federal individual income tax return of Gs, petitioners in docket No. 10103-75, was due on June 15, 1973. The return was received by the IRS on June 18, 1973. Held: (5) Gs' return was not timely filed; Gs do not have reasonable cause for filing late; and so, an addition to tax under sec. 6651(a), I.R.C. 1954 is sustained. Paul E. Anderson, for the petitioners. William E. Saul, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income taxes and additions to tax under section 6651(a)[2] *211 against petitioners as follows: Addition to Tax
Docket No.
Year
Deficiency
Sec. 6651(a)
Ross R. Sanborn
[3] 9236-75
1967
$3,754.01
and Caroline C.
1968
6,340.66
$603.44
Sanborn
1970
2,329.45
1281-78
1971
1,114.00
1972
1,853.00
1973
1,937.00
Harold H. Saur and
10102-75
1967
146.83
Maribeth M. Saur
1968
9,475.00
1969
358.42
1970
5,410.13
1278-78
1971
3,007.00
1972
7,637.00
1973
9,594.00
Fred W. Greenlaw and
10103-75
1968
6,783.07
Mary T. Greenlaw
1969
245.96
1970
5,197.06
1971
6,660.00
1972
14,346.00
717.30
1277-78
1973
13,469.00
Taxable
Addition to Tax
Docket No.
Year
Deficiencies
Sec. 6651(a)
Francis J. Jacobus
10104-75
1967
137.14
and Ruth A. Jacobus
1968
7,182.70
1969
60.79
1970
3,232.18
1280-78
1971
1,357.00
1972
4,308.00
1973
5,809.00
Donald G. Black and
10105-75
1967
2,204.58
Catherine B. Black
1968
8,168.37
1970
6,188.20
1279-78
1971
1,463.00
1972
1,341.00
These cases have been consolidated for trial, briefs, and opinion. The *212 parties have disposed of most of the issues. [4] *213 The issues for decision are as follows: (1) Whether petitioners are entitled to loss deductions for 1970 through 1973 on account of losses suffered by Walnut Growers, Incorporated (hereinafter sometimes referred to as "Walgro"), an electing small business ("subchapter S") corporation; (2) Whether petitioners are entitled to a casualty loss deduction for 1968 on account of the flooding of certain property; and (3) Whether petitioners Fred W. Greenlaw and Mary T. Greenlaw are liable for an addition to tax under section 6651(a) for 1972. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions in the instant cases were filed--petitioners Ross R. Sanborn (hereinafter sometimes referred to as "Sanborn") and Caroline C. Sanborn, husband and wife, resided in Lafayette, California; petitioners Harold H. Saur (hereinafter sometimes referred to as "Saur") and Maribeth M. Saur, husband and wife, resided in Diablo, California; petitioners Fred W. Greenlaw (hereinafter sometimes referred to individually as "Greenlaw") and Mary T. Greenlaw, husband and wife, resided in Moraga, California; petitioners Francis J. Jacobus (hereinafter sometimes referred to as "Jacobus") and Ruth A. Jacobus, husband and wife, resided in Pioneer, California; and petitioners Donald G. Black (hereinafter sometimes referred to as "Black") and Catherine B. Black, husband and wife, resided in San Rafael, California. Greenlaw and Mary T. Greenlaw are hereinafter sometimes referred to as "the Greenlaws". Subchapter S Status
Walgro was incorporated on December 7, 1964, under California law. Its primary business is growing and cultivating *214 walnuts and cherries. In January 1965, for its first, short taxable year ending January 31, 1965, [5] Walgro filed its election to be taxed as a small business corporation (hereinafter sometimes referred to as "a subchapter S corporation") under subchapter S of chapter 1, and the shareholders as of January 31, 1965, filed their consents thereto. Walgro's original shareholders and their initial contributions are reflected in table 1. Table 1 Number of
Shareholder
Shares
Contribution
Sanborn
1,000
$11,500.00
Saur
1,000
11,500.00
Greenlaw
1,000
11,500.00
Jacobus
1,000
11,500.00
Black
1,000
11,500.00
5,000
[6] $57,500.00
In September 1968, [7] Henry L. McIntyre (hereinafter sometimes referred to as "McIntyre") was admitted as a shareholder of Walgro and made a capital contribution of $50,000. In February 1969, [8] *216 Fred M. Charles (hereinafter sometimes referred to as "Charles") *215 was admitted as a shareholder of Walgro and made a capital contribution of $30,000. Timely consents to the Walgro's subchapter S corporation election were made by McIntyre and Charles. On December 30, 1964, the petitioner-husbands, together with their respective wives, and Walgro purchased contiguous parcels, collectively known as the Hartley Island property (hereinafter sometimes referred to as "Hartley Island") from M. E. Biggs and Betty Biggs, for a total consideration of $569,000.00 [9] ($94,833.33 each). All the petitioners leased their respective portions of Hartley Island to Walgro. Hartley Island is located in the Sacramento Valley. Sometime in early 1965, Walgro purchased a piece of property, known and referred to as the Annex, about one mile south of Hartley Island. Sometime in late 1965, Walgro purchased property known and referred to as the River Ranch, about 10 miles south of Hartley Island. All three pieces of property, Hartley Island, the Annex, and the River Ranch (hereinafter sometimes referred to collectively *217 as "the properties"), are bordered on the west by the Sacramento River. Walgro planted the properties with walnut trees and cherry trees. During the period beginning on the date of Walgro's incorporation, December 7, 1964, and ending sometime in mid-1967, Walgro borrowed crop loans from the Bank of California (hereinafter sometimes referred to as "the Bank") to pay for expenses in developing its orchards. In the summer of 1967, when Walgro's outstanding indebtedness to the Bank was about $275,000, the Bank notified Walgro that it would no longer finance Walgro after the end of that crop year. Walgro applied for a loan from Wells Fargo to pay off the crop loan debt to the Bank, but Wells Fargo rejected the application. Sometime in early 1967, Walgro hired Elton Waggener (hereinafter sometimes referred to as "Waggener"), a real estate consultant. Black, as the financial vice-president of Walgro, consulted Waggener to help Walgro solve its financial problems. Waggener led Black to Richard L. Derry (hereinafter sometimes referred to as "Derry"), a realtor. From Derry, Black understood that Harry T. Holgerson, Jr. (hereinafter sometimes referred to individually as "Holgerson"), *218 and Mary E. Holgerson, husband and wife, were interested in entering into a sale-leaseback arrangement with Walgro. Holgerson and Mary E. Holgerson are hereinafter sometimes collectively referred to as "the Holgersons".
Curtis M. Karplus (hereinafter sometimes referred to as "Karplus"), an attorney who represented Walgro during the period of 1967 through 1976, was hired to draft a document to reflect a transaction whereby Walgro sold the properties to the Holgersons and then leased the properties back. Karplus prepared a draft of a general agreement, dated November 1, 1967. This draft provided that the properties would be sold by Walgro for $1,425,150 and that Walgro would have the option to repurchase the properties at some specified price during 1975, 1976, or 1977. On November 10, 1967, a meeting was held to discuss the proposed transaction and the draft. The following persons attended this meeting: Greenlaw, Black, and Saur (for Walgro); Karplus; Holgerson; Julius N. Stern (hereinafter sometimes referred to as "Stern"), acting as tax counsel for Holgerson; Paul Roemer, Holgerson's insurance broker and partner in various real estate investments; Dale H. Kimbell (hereinafter *219 sometimes referred to as "Kimbell"), Holgerson's accountant; and Derry. During this meeting, Stern insisted that Walgro's option to buy back the properties be removed because it would be a red flag to the Internal Revenue Service to audit the Holgersons. At the meeting, it was agreed to include a right of first refusal instead of the option and to increase the proposed purchase price by about $500,000 because of this change. The transaction between Walgro and the Holgersons (hereinafter referred to as "the Walgro-Holgersons transaction") as finally structured consisted of three steps, all of which took place on December 13, 1967, pursuant to a written, general agreement. The first step was a sale of those parcels making up Hartley Island, which were owned by petitioners, to Walgro in exchange for cash (aggregating $20,833.35) and the assumption by Walgro of petitioners' indebtednesses on the parcels (aggregating $474,166.65), for a total of $495,000. [10] *220 The second step was a sale from Walgro of Hartley Island (of which, after the first step, Walgro was the sole owner), the Annex, and the River Ranch to the Holgersons for $1,955,250. The purchase price was paid as follows: (1) a $25,000 cash payment into an escrow account; (2) assumption by the Holgersons of then existing indebtednesses on the properties, aggregating $957,075.50 principal (as reflected in table 2), plus interest; and (3) a promissory note from the Holgersons in the amount of $973,174.50. [11]
Table 2 Holders of Deed
Principal Indebtedness
Property
Deed of Trust
of Trust
Assumed
Hartley Island
First
The Travelers
$300,000.00
Insurance Co.
Second
M. E. Biggs and
269,000.00
Betty Biggs
The Annex
First
The Travelers
150,000.00
Insurance Co.
Second
Rudy W. Narod
20,443.50
The River Ranch
First
The Travelers
101,096.00
Insurance Co.
Second
Wilbur W. Willis,
116,536.00
Grace M. Willis,
Kenneth C. Bryan,
and Alice R. Bryan
Total:
$957,075.50
*221 Under the terms of the general agreement the Holgersons prepaid interest due on the promissory note to Walgro in the amount of $250,000 in December 1967. This amount was applied toward the annual interest payments due in 1973 through 1976. [12]
Walgro recorded the transaction in its books as a sale of the properties to the Holgersons and recorded in its books, as interest income, this $250,000 and the payments made by the Holgersons on or about February 1, 1968, February 3, 1969, and April 14, 1969. Walgro also requested a letter ruling from the Internal Revenue Service in which it described the transaction as a sale. The Internal Revenue Service, in a letter dated January 5, 1968, responded as follows: In response to your letter of December 6, 1967, which was transmitted to us by Mr. Curtis M. Karplus, we are pleased to let you *222 know that the amount of a debt which you owed and which was assumed by a purchaser when he bought the encumbered property is properly includable in your gross receipts under section 1372(e)(5) of the Internal Revenue Code of 1954. You have indicated that if the $957,075.50 of your indebtedness assumed by the buyer is includable in your gross receipts, then your passive income will not amount to more than 20 percent of your gross receipts for this taxable year and you can, therefore, retain your status as a Subchapter S corporation. Our conclusion is based on the facts of your case, which are restated below together with a discussion of the applicable law and regulations. RESTATEMENT OF FACTS The information submitted discloses that you were incorporated in the State of California on December 7, 1964, and that you filed your election to be treated as a small business corporation on January 5, 1965. You have maintained Subchapter S status since that date and you wish to continue in such status. Your books are kept on the cash basis, your taxable year running from February 1 to January 31. On December 6, 1967, you executed an agreement to sell certain ranch properties for a total *223 price of $1,955,250.00, to be received by you as follows: $25,000.00
cash down payment
973,174.50
promissory note
957,075.50
assumption by the buyer of
your total indebtedness on
the property.
You will receive no payment on the principal of the note during the taxable year. However, the buyer will pay $250,000.00 in cash to you this year as prepaid interest on the note, which amount must be included in gross receipts. You understand that the prepaid interest is the "passive" type of income which cannot exceed 20 percent of your gross receipts without the loss of your Subchapter S status under the provisions of section 1372(e)(5) of the Code. It is indicated that if the $957,075.50 of your indebtedness assumed by the buyer is includable in your gross receipts, then your passive income will not amount to more than 20 percent of your gross receipts for this taxable year and you can, therefore, retain your status as a Subchapter S corporation. DISCUSSION OF LAW AND REGULATIONS Section 1372(e)(5) of the Code provides, in part, that a taxpayer's election as a small business corporation shall terminate if that corporation has gross receipts more than 20 percent of which is passive income. The term *224 "gross receipts" is defined in section 1.1372-4(b)(5)(ii) of the Income Tax Regulations as including the total amount received or accrued during the corporation's taxable year from the sale or exchange of any kind of property. The "amount" received or accrued from the sale or exchange of property is not confined to cash items, but includes other items which enter into the amount realized by a taxpayer. Thus, there would be includable property in kind received by the corporation as well as liabilities of the corporation taken over by another party and encumbrances on property sold by the corporation. Cf. Beulah B. Crane v. Commissioner,331 U.S. 1 (1947), Ct. D. 1684, C.B. 1947-1, 97. This is true regardless of your method of accounting for the sale. The assumed liability can be said to be constructively received in the year of sale due to the fact that you are relieved of the burden of the mortgage. Because this is the only time this assumed liability is accounted for, it is also the time for it to be included in your gross receipts under section 1372(e)(5) of the Code. CONCLUSION Therefore, based on the facts presented regarding the above-described transaction, the $957,075.50 *225 of your indebtedness assumed by the buyer is properly includable in your gross receipts for the year of the sale, under section 1372(e)(5) of the Code. This letter ruling was attached to Walgro's fiscal year 1968 Form 1120-S. The third and final step of the transaction was the lease of the properties to Walgro from the Holgersons. The term of the lease was from December 13, 1967, to January 31, 1978. Walgro, as lessee, had the right to extend the term for an additional eight years. The lease provided for rental payments as follows: (1) the first year, $15,000; (2) the second year, $45,000; (3) the third through ninth years, $132,500; and (4) the tenth year, $133,500. If Walgro exercised its right to extend the lease for an additional eight years, then the lease payments would be $142,500 for each of the eight additional years. Under the lease, Walgro had the following duties (in addition to the duty to pay the agreed rent): 1. "To continue the farming operations on the [properties] and to conduct these operations in a good and farmer-like manner. Lessee [Walgro] shall not, however, be liable for the consequences of any force majeure, which shall be defined as any cause not *226 within Lessee's reasonable control, such as an act of God (e.g., lightning; fire; extraordinary drought, flood, or freezing; earthquake; epidemic, etc.); a riot or labor disturbance; a governmental act or decree; etc." 2. "To obtain and maintain, at Lessee's expense, insurance from an insurance company acceptable to Lessor [the Holgersons], giving Lessor standard coverage against the normally covered risks inherent in the ownership of such Property, including $500,000 coverage against liability for injury or damage to person or property." 3. To promptly pay the property taxes, assessments, and other levies or charges that may be made on the properties, and to pay all the expenses arising out of the farming operations. Under the lease, the Holgersons had the following rights and duties: 1. The right to deal with the properties as they saw fit after the term of the lease (or after the additional 8-year period if Walgro exercised its right to extend the lease). [13]
2. The right to sell the properties at any *227 time subject to Walgro's right of first refusal. 3. The duty of paying the existing indebtednesses on the properties. [14]
All three steps of the transaction--sale by petitioners to Walgro, sale by Walgro to the Holgersons, and lease by the Holgersons to Walgro--were embodied in a single document. This document did not contain an option exercisable by Walgro to buy back the properties. This document contained the following provision, under the heading "F. MISCELLANEOUS PROVISIONS": 5. Entire Agreement. This Agreement contains the entire agreement, and supersedes all prior written or oral agreements, with respect to the subject matter between the parties. Walgro paid rent to the Holgersons from January 31, 1968, through January 31, 1976. Walgro deducted those payments as rental expenses on its Forms 1120-S for its fiscal years 1968 through 1973. The Holgersons paid $68,122.22 interest each year (see n. 11, supra) on the note to Walgro for the period beginning February 1, 1968, and ending January 31, 1976. Walgro *228 reported these payments as interest income on its Forms 1120-S for its fiscal years 1968 through 1973. The January 31, 1971, and 1972 interest payments were offset in entirety, and the January 31, 1973, interest payment was offset in part, by Walgro's rental payments to the Holgersons. The Holgersons' initial $250,000 prepaid interest was applied against the remainder of the January 31, 1973, interest payment obligation and against the entire interest payment obligations for January 31, 1974, 1975, and 1976. The parties to the Walgro-Holgersons transaction did not have an agreement that Walgro would have an option to repurchase the properties. The transaction between Walgro and the Holgersons is a sale-leaseback and the payments by the Holgersons on the note to Walgro are interest income to Walgro. Walgro received in its fiscal year 1970, and reported on its Form 1120-S for this fiscal year, receipts (not reduced by returns and allowances, cost, or deductions) of $225,780, categorized as shown in table 3. Table 3 Type of Receipts
Amounts
Gross Sales
$147,524
Interest
* *229 71,843
Gross Rents
2,790
Gross Sales Proceeds
2,817
from Sale of Machinery
Gross Miscellaneous
806
Receipts
$225,780
The sum of the interest ($71,843) and gross rent receipts ($2,790) received by Walgro during its fiscal year 1970 is $74,633, which is 33.1 percent of the total amounts of receipts for its fiscal year 1970 ($225,780). Walgro reported net operating losses on its Forms 1120-S for each of its fiscal years 1968 through 1973. Petitioners reported on their Federal individual income tax returns for each of the years before the Court, and respondent disallowed, petitioner-husbands' propertionate shares of the losses reported by Walgro. Casualty Loss
In January 1968, the Sacramento River overflowed its banks and flooded certain portions of the Annex and Hartley Island. At the time of the flood, the Holgersons were the owners and lessors of the Annex and Hartley Island, and Walgro was the lessee. The Holgersons and Walgro had entered into the lease on December 13, 1967, and the lease was recorded in the land records of Glenn County, California, on December 13, 1967. Under the lease, Walgro was not liable for the consequences of any force majeure, which *230 was defined to include floods. Greenlaws' Addition to Tax
The Greenlaws filed an application with the Internal Revenue Service for an automatic extension to file their 1972 joint Federal individual income tax return (hereinafter sometimes referred to as "the return") by June 15, 1973. They did not ask for a further extension of time. Greenlaw obtained the return from his accountant about 6:00 p.m. on Friday, June 15, 1973, took it to his wife for her signature, and deposited it inside the post office in Concord, California, about 10:10 p.m. on June 15, 1973. At that time, the postal clerks' windows were closed. The envelope in which the return was mailed bears a United States Postal Service postmark dated June 16, 1973. The envelope also bears a private postage meter mark dated June 15, 1973. The return was received by the Internal Revenue Service at Fresno, California, on Monday, June 18, 1973. Greenlaw had previously told the accountant that he had to have the return by June 15. Greenlaw understood that it was sufficient if he "got it in the mail on the 15th". OPINION I. Subchapter S Status
Under section 1372(b)(1), [15] a subchapter S corporation generally is not subject *231 to the corporate income tax; instead, under section 1373(a)[16] *232 the corporation's income is taxed to the shareholders. Concomitantly, when a subchapter S corporation suffers a net operating loss, section 1374(a)[17] provides that the loss is passed through to the shareholders. Under section 1372(a)(5), [18] *234 if more than 20 percent of a subchapter S corporation's gross receipts are passive investment income--including interest--then *233 the corporation loses its subchapter S status and its income and losses are taxed to the corporation and not passed through to the shareholders.[19] This loss of subchapter S status applies to the corporation's taxable year in which the 20-percent limit is exceeded, and to all of the corporation's succeeding taxable years. Llewellyn v. Commissioner,70 T.C. 370 (1978). See Van Etten v. Commissioner,623 F.2d 622 (CA9 1980), affg. a Memorandum Opinion of this Court. [20] Respondent contends that petitioners are not allowed to pass through Walgro's losses from 1970 onward because Walgro's subchapter S corporation status terminated under section 1372(e)(5) during its fiscal year 1970. Respondent maintains that this is so because Walgro received passive investment income in excess of 20 percent of its gross receipts for that year. Respondent includes as passive investment income interest *235 from the Holgersons, on account of Walgro's 1967 sale of the properties to the Holgersons. Petitioners claim that Walgro's subchapter S corporation status did not so terminate. They contend that, despite the form of the transaction between Walgro and the Holgersons as a sale-leaseback, in substance the transaction was merely a financing arrangement. Petitioners' position is that the payments denoted as interest were, in substance, loans and not interest income, and Walgro's subchapter S corporation status did not terminate because it did not receive passive interest income in excess of 20 percent of its gross receipts in its fiscal year 1970. If we conclude that the transaction is a sale-leaseback, then petitioners, in the alternative, argue that for purposes of determining whether the 20-percent threshold of section 1372(e)(5) was crossed, the rental payments Walgro made to the Holgersons must be netted against the interest payments received by Walgro from the Holgersons. Respondent presents two responses to petitioners' alternative argument. Firstly, respondent argues that such netting is not allowed under section 1372(e)(5). Secondly, respondent contends that the argument *236 is not relevant to Walgro's fiscal year 1970, because any actual netting of rental payments and interest payments by Walgro and the Holgersons first occurred after Walgro's fiscal year 1970 on January 31, 1971, and later. We agree with respondent. A. Sale-Leaseback or Financing Transaction
The Walgro-Holgersons transaction was, in form, a sale-leaseback. While it is well established that the economic substance will control the tax consequencs rather than the form, Helvering v. Lazarus & Co.,308 U.S. 252 (1939), "[w]e will not relieve a party from the tax consequences of the form in which he or she appears to have molded a transaction, in the absence of proof that that form does not properly reflect the transaction." Yamamoto v. Commissioner,73 T.C. 946, 954 (1980), affd. without published opinion 672 F.2d 924 (CA9 1982). In Don E. Williams Co. v. Commissioner,429 U.S. 569, 579-580 (1977), the Supreme Court, albeit in a somewhat different context, gave the following guidance: 2. The taxpayer suggests that the transaction equates with a payment of cash to the trustees followed by a loan, evidenced by the note in return, in the amount of the cash advanced. But "a transaction is *237 to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred. "… This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not… and may not enjoy the benefit of some other route he might have chosen to follow but did not." Commissioner v. National Alfalfa Dehydrating,417 U.S. 134, 148-149 (1974). See Central Tablet Mfg. Co. v. United States,417 U.S. 673, 690 (1974). What took place here is clear, and income tax consequences follow accordingly. We do not indulge in speculating how the transaction might have been recast with a different tax result. [Fn. ref. omitted.] In their attempt to persuade us that the substance of the Walgro-Holgersons transaction differs materially from its form, petitioners paint a picture of themselves, Walgro, and the Holgersons agreeing to a financing arrangement. However, the picture they paint shows them agreeing to make this financing arrangement appear to be a sale-leaseback. Further, it shows them doing so in order to mislead the Internal *238 Revenue Service. Finally, it shows them agreeing to thus mislead the Internal Revenue Service in order to persuade the Internal Revenue Service that the Holgersons' income tax liabilities are less than these liabilities would be if the truth were known (i.e., the truth as petitioners describe it). In order to thus hoodwink the Internal Revenue Service, petitioners assert, they signed certain documents, but failed to sign an agreement they reached with Holgerson that Walgro have the option to repurchase the properties. They failed to sign the option agreement, they assert, because such a signed option might have disclosed their scheme to the Internal Revenue Service. Thus, this failure was understood by petitioners to be an essential part of the plan (some might call it "conspiracy") to mislead the Internal Revenue Service so as to reduce the Holgersons' taxes (some might call it "fraud"). In active pursuance of this asserted scheme, Walgro reported the transaction on its Form 1120-S as though it were a sale-leaseback. To lend a greater air of verisimilitude, Walgro asked respondent for a letter ruling bottomed on the idea that the arrangement was a sale-leaseback. And, petitioners *239 assert, once the Holgersons' tax returns had "cleared his tax audit", i.e., once the scheme to mislead the Internal Revenue Service had succeeded, then the option to repurchase was to be signed and the true intention of petitioners, Walgro, and the Holgersons would be effectuated. To this last step, petitioners apply the label "gentleman's agreement". [21]
In order to persuade us that we should disregard the form of the Walgro-Holgersons transaction (i.e., that the form was part of a scheme to mislead the Internal Revenue Service and that the contract, deeds, and lease signed on behalf of Walgro were intentionally false and that the Forms 1120-S filed by Walgro for its fiscal years 1968 through 1973 also were intentionally false, [22] *240 petitioners must present at least strong proof [23] that the Walgro-Holgersons transaction was a financing arrangement and not a sale-leaseback. See, e.g., our analysis in Major v. Commissioner,76 T.C. 239, 247-249 (1981). [24] *241 Petitioners have failed to persuade us that they thus schemed to mislead the Internal Revenue Service.On the contrary, we conclude and we have found that the Walgro-Holgersons transaction was a sale-leaseback. On the basis of the record in the instant cases, the following factors are the principal ones that lead us to this conclusion: (1) The documents signed by petitioners, Walgro, and the Holgersons provide for a sale-leaseback arrangement. (2) There was no option to repurchase. (3) The sale price of the properties was increased about $500,000 when the parties to the transaction eliminated the option to repurchase. Thus, the repurchase option was intentionally bargained out of the transaction. (4) The Holgersons did not resell the properties to petitioners or Walgro. In fact, by the time of the trial, Walgro's lease had expired and the Holgersons owned and operated the properties themselves. *242 (5) All the parties to the Walgro-Holgersons transaction (see Roemer v. Commissioner,69 T.C. 440 (1977), affd. sub nom. Holgerson v. Commissioner,638 F.2d 104 (CA9 1981)) reported the transactions on their tax returns (signed under penalties of perjury) as a sale-leaseback and not as financing arrangement. (6) The Holgersons assumed the underlying indebtednesses and made substantial payments of both principal and interest thereon. (See n. 14, supra.) Petitioners make a series of contentions designed to persuade us that the form chosen for the Walgro-Holgersons transaction was designed to mislead the Internal Revenue Service and that the intent of both Walgro and the Holgersons was to enter into a financing arrangement. 1. Option to Repurchase
Petitioners contend that Walgro and the Holgersons had a "gentleman's agreement" whereby the Holgersons would grant Walgro an option to repurchase the properties in the future. However, Holgerson testified that it was his understanding that no such agreement existed. Further, the written general agreement did not contain an option and the written agreement was the entire agreement between the parties. We have found, supra, that the parties *243 to the Welgro-Holgersons transaction did not have an agreement that Walgro would have an option to repurchase the properties. We recognize that an option to repurchase property at a bargain price as part of a sale-leaseback is a significant indicium of the existence of a financing arrangement rather than a valid sale-leaseback; however, no option exists in the instant cases. Since we have concluded that no option exists, we do not address respondent's argument that an option to purchase real property is subject to California's statute of frauds and thus, an oral option is unenforceable. 2. California Law
Petitioners contend that under California law the Walgro-Holgersons transaction "would be characterized as a hidden security device, a secured loan transaction." To begin with, "[s]tate law may control only when the [operation of the] federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." Burnet v. Harmel,287 U.S. 103, 110 (1932). Such is not the case here, and State law does not control. See Weiss v. Wiener,279 U.S. 333, 337 (1929). Further, even if we were to look to State law, the analysis that petitioners present *244 is flawed because it is based on the existence of an option to repurchase by Walgro and we have found that no such option exists. 3. Reasonable Return on Investment Petitioners assert that "the rentals paid [by Walgro] were geared to provide Holgerson with a reasonable return on his initial $275,000 investment". Petitioners rely on a letter (dated September 21, 1967) from Derry to Karplus and Black, and a schedule prepared by Kimbell in October 1976. Firstly, the 1976 schedule shows that the Holgersons invested much more than $275,000 ($25,000 escrow payment plus $250,000 prepaid interest payment) in the properties. As we have found (n. 14, supra) by the end of 1976, the Holgersons had paid about $365,000 in principal and about $430,000 in interest on the indebtedness on the properties, in addition to their payments to Walgro. Secondly, the 1976 schedule, which petitioners introduced as their exhibit, indicated that, as of January 31, 1977, the Holgersons would need an additional $293,645 in order to receive "approximately 7% return on net invested cash". Thus, the rentals fell far short of providing the Holgersons with the seven-percent return petitioners postulate. Thirdly, *245 the 1967 letter proposes an arrangement which would involve an option on Walgro's part to repurchase the properties. Indeed, Derry's letter explores ways to force Walgro to exercise the option. The letter states "[m]y client does not want to be in the walnut or farming business." Yet, the Holgersons insisted on removal of Walgro's option to repurchase, Walgro did not repurchase, and the Holgersons owned and operated the properties at the time of the trial. Thus, the 1967 letter does not describe what the parties finally agreed to do nor does it describe what happened under the agreement. Also, the 1976 schedule's description of what happened conflicts with the proposition for which petitioners cite it.
4. Excessive Sale Price
In an attempt to show that the sale of the properties was not really a sale, petitioners contend that "[a]t the time of the Walgro-Holgerson transaction the fair market value of the properties involved--Hartley Island, River Ranch and the Annex--was $1,450,000".They argue that the sale price of $1,955,250 was so much higher than the true fair market value of the properties that the parties to that transaction would not have agreed to a bona fide sale for the *246 latter price. On brief, petitioners rely on the testimony of Black, Saur, Jacobus, and Greenlaw to support their contentions of value. Jacobus testified that he based his estimate of $1,450,000 fair market value "[o]n other sales of property and just knowledge of what was going on in the area. We were--among ourselves, we were discussing valuations all of the time. Some of us, I guess I almost had daily contact, see, and three of us were working in the same building. And we had many informal meetings and discussions." Jacobus then identified the "three of us" as "Mr. Black, Mr. Greenlaw, and myself." Saur and Greenlaw testified that the fair market value of the properties was $1,450,000. They were not asked to, and did not, explain how they came to that conclusion. Black testified that the fair market value of the properties was $1,350,000, and that he relied on Waggener in arriving at this conclusion. Black produced a letter from Waggener to him, dated October 12, 1967, to which was attached a three-page valuation report from one C. F. Trailer. Trailer's report valued Hartley Island at $854,993 and the Annex at $369,840. Waggener's letter indicated that Waggener thought *247 that Trailer's total of $1,224,833 was "somewhat misleading from a conservative viewpoint". Waggener's letter indicated that he preferred a value of $1,500,000. Neither Waggener's letter nor Trailer's report refers to the River Ranch. None of the foregoing evidence is persuasive, because petitioners have failed to show what information led to the witnesses' conclusions. [25]
Only Black sought to provide some meaningful underpinning to his conclusion as to value. Unfortunately for petitioners, the underpinning turned out to be an undermining. Black testified to having *248 relied on Waggener. But the only advice from Waggener that appears in the record is that Hartley Island and the Annex were worth about $1,500,000. Black failed to provide any explanation of how this advice led him to conclude that Hartley Island, the Annex, and the River Ranch were worth in the aggregate only $1,350,000. [26]
A comparison of Trailer's estimates and Waggener's advice as to fair market value on the one hand, with the outstanding indebtedness on Hartley Island and the Annex (see table 2, supra) on the other hand, indicates that these two properties were worth about one and one-half times to two times their outstanding indebtedness. If the same conditions applied to the River Ranch, that would suggest a range of values of $325,000 to $435,000 for this property. This would suggest an aggregate value for the properties of about $1,825,000 to $1,935,000. Of course, this is a weak foundation, at best, for valuing the properties, but it does not appear to be weaker than the foundation petitioners have laid for their *249 estimates. At trial, petitioners presented an expert witness who testified to a $1,341,000 value for the properties. Although his conclusion would appear to support petitioners' contention as to the mala fides of the sale-leaseback, petitioners do not refer to this expert's evidence in those parts of their briefs that deal with this issue. [27] For the following reasons, we, too, decline to be persuaded by this expert's testimony. Firstly, this expert testified that he had used the income capitalization method for valuing the properties, and that the valuation under this method was based on gross yields of properties. Yet, he conceded that he had not examined Walgro's books to find out the actual yields of the properties. Further, he concluded that he had not visited the properties in preparing the report. Thus, we are at a loss to understand how he had a meaningful basis for applying the valuation method which he said he used. Secondly, this expert stated that he had also used the comparable sales method for valuing the properties. On cross-examination, he stated that he had *250 considered four sales in connection with this method of valuation. One was a purchase by him of a walnut orchard property in 1970, nearly three years after the Walgro-Holgerson transaction. The second and third ones were sales of peach orchard and almond orchard properties in 1974 and 1972, respectively. (These sales occurred even further from the date of the transaction in the instant cases.) The fourth one was a sale of undescribed orchard property in 1974. We conclude that the difference in the type of orchard (i.e., the fruit) and the difference in time of the sales from the Walgro-Holgersons transaction seriously impair the value of these sales as comparable sales. We conclude that petitioners have failed to show that the fair market value of the properties was so far different from the sales price in the Walgro-Holgersons transaction as to cast doubt on the bona fides of this transaction. See Commissioner v. Brown,380 U.S. 563, 572-574 (1965). 5. Excessive Rentals
Petitioners assert that the "rentals paid by Walgro were entirely independent of the fair rental value." Black testified that the fair rental value of the properties on December 13, 1967 (the date of the Walgro-Holgersons *251 transaction) was $80,000. Although Black's evidence may be admissible under Rule 701, Fed. R. Evid., it is entitled to little or no weight since (1) Black has not been shown to be an expert and (2) Black has provided us with no explanation of how he arrived at the amount to which he testified.See Kestenbaum v. Falstaff Brewing Corporation,514 F.2d 690, 699 (CA5 1975). Black's unexplained and unsupported opinion does not provide a foundation sufficient to persuade us that the rental payments in the lease are "entirely independent of fair rental value." (See n. 25, supra.) 6. Sun Oil or Frank Lyon Petitioners rely on Sun Oil Co. v. Commissioner,562 F.2d 258 (CA3 1977), revg. a Memorandum Opinion of this Court [28] and Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (CA9 1982). They maintain that Frank Lyon Co. v. United States,435 U.S. 561 (1978), should not govern the tax treatment of the Walgro-Holgersons transaction. In Sun Oil,Hilton, and Frank Lyon, the taxpayer was the seller-lessee. In each case, the taxpayer defended the form of the transaction. In each case, the court examined into the substance of the transaction. In Frank Lyon, *252 the Supreme Court held that the transaction there in dispute was a sale-leaseback, consistent with its form. The Court of Appeals for the Third Circuit in Sun Oil and this Court in Hilton held that the transactions there in dispute were financing arrangements, contrary to their forms. In the instant cases, as the courts did in Frank Lyon,Sun Oil, and Hilton, we examine into the substance of the transaction. However, unlike Frank Lyon,Sun Oil, and Hilton, in the instant cases, petitioners disavow the form of transaction in which Walgro participated, and so we impose on them the burden of producing "strong proof" to overcome the legal effect of the form of the Walgro-Holgersons transaction. As our analysis of petitioners' various contentions shows, petitioners have failed to provide such strong proof; at best, the evidence they point to is inclusive, whether we view as the model Sun Oil and Hilton or Frank Lyon.
Accordingly, on the basis of the record in the instant cases, we conclude that the amounts Walgro received from the Holgersons as interest on account of the Walgro-Holgersons transaction really were interest on the Holgersons' debt to Walgro and were not loans from the *253 Holgersons to Walgro. We hold for respondent on this issue. B. Netting
We now address petitioners' alternative argument that for purposes of section 1372(e)(5), the interest payments made by the Holgersons by Walgro should be netted against the rental payments made by Walgro to the Holgersons. In Llewellyn v. Commissioner,70 T.C. 370 (1978), the corporation was obligated to deposit an amount in a bank account, in connection with a lease. The taxpayer sought to net, for purposes of section 1372(e)(5), the interest income that the corporation received on this bank deposit against the interest and other expenses that the corporation paid in borrowing the money it had deposited. We held (70 T.C. at 372) that for purposes of section 1372(e)(5), gross receipts is the total amount of receipts received or accrued under the method of accounting used by the corporation in computing its taxable income not reduced by returns and allowances, cost, or deductions. Section 1.1372-4(b)(5)(iv)(a), Income Tax Regs. [29] *254 Petitioners concede that for purposes of section 1372(e)(5), gross receipts are not to be reduced by deductions. They seek to distinguish Llewellyn by asserting that in the latter case the taxpayers tried to net the effect of distinct transactions in which three parties (i.e., lessee-borrower-depositor, lessor, and lender) were involved. Petitioners argue that in the instant cases, only two parties were involved and that from the outset, the parties to the Walgro-Holgersons transaction intended that "the transaction was to produce income for Holgerson at Walgro's expense." Returns and allowances ordinarily are matters arising out of the same transactions giving rise to income; they ordinarily involve only the same parties as the transactions giving rise to the income. Yet, the regulation is specific in stating that "the total amount of receipts is not reduced by returns and allowances".Clearly, the test proposed by petitioners is inconsistent with the regulation, as applied to *255 the denominator of the statutory fraction ("passive investment income" divided by "gross receipts"). Petitioners do not challenge the validity of the regulation in this respect. We implicitly upheld the regulation in Llewellyn, and we see no reason to take a different view of the same regulation in the instant case. If we do not net amounts in determining the gross receipts denominator merely because these amounts arise from single transactions involving only two participants, then we see no warrant for netting such amounts in determining the passive investment income numerator merely because these amounts arise from single transactions. See Morris v. Commissioner,70 T.C. 959, 998 (1978). The test proposed by petitioners, then, appears to conflict with our reading of the law, the applicable regulation, and the implications of the regulation. Accordingly, we reject this test. Since petitioners have presented no other basis for distinguishing Llewellyn, and we find none, we conclude that Llewellyn controls the netting issue. We conclude that Walgro is not permitted to net its rental payments against its interest income in determining whether its passive income for its fiscal *256 year 1970 exceeded the 20-percent level permitted by section 1372(e)(5). We hold for respondent on the netting issue. Accordingly, we hold, for respondent, that Walgro's status as a subchapter S corporation terminated for its fiscal year 1970 and thereafter. As a result, Walgro's net operating losses for its fiscal year 1970 and thereafter may not be passed through to petitioners. II. Casualty Loss
Petitioners contend that they are entitled to deduct a loss resulting from the flooding of the Hartley Island and Annex properties in 1968, "under Sections 165(a) and 1374(c)(2) * * * whether Walgro is found to be the owner of the damaged property in January 1968, or merely the holder of an eighteen year leasehold at that time." Respondent concedes the flood, but argues that petitioners are not entitled to a loss deduction under section 165(a) because section 165(b) prevents the deduction from exceeding Walgro's adjusted basis in the property. Respondent contends that "[s]ince Walgro has sold the property and reduced the reported gain by its adjusted basis (cost) [on its 1967 tax return], Walgro has no basis in the property on which to claim a loss." We agree with respondent's conclusion. *257 [30] *258 Section 165[31] provides for a deduction for a casualty loss, which is not compensated for by insurance or otherwise, but the amount of the deduction is not to exceed the taxpayer's adjusted basis. Petitioners have the burden of proving entitlement to a casualty loss. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In particular, in the instant cases petitioners have the burden of proving that Walgro had a basis in the property that was damaged or destroyed. United States v. Koshland,208 F.2d 636, 641 (CA9 1954); Millsap v. Commissioner,46 T.C. 751, 760 (1966), affd. without discussion *259 of this issue 387 F.2d 420 (CA8 1968); Towers v. Commissioner,24 T.C. 199, 239 (1955), affd. sub nom. Bonney v. Commissioner,247 F.2d 237 (CA2 1957). As seller-lessee, Walgro presumably had no basis in the land after the sale. Petitioners have not directed us to any evidence in the record that would show that Walgro had any basis in any of the property that was damaged by the flood. (For example, petitioners have failed to show that Walgro capitalized any of the expenditures it may have made in connection with the trees.) In Millsap v. Commissioner,46 T.C. at 760, we stated as follows: There have been cases where a failure of proof on the issue of basis has been overlooked to permit the allowance of a small casualty loss deduction where it could reasonably be inferred from other facts of record that the allowed amount did not exceed basis, but this is not such a case. We do not feel that application of the Cohan rule is appropriate here on the question of basis. [Fn. ref. omitted.] The instant cases, also, provide no occasion for application of the Cohan rule ( Cohan v. Commissioner,39 F.2d 540 (CA2 1930)), and petitioners have not sought to have us apply it. Petitioners refer *260 to damage to Walgro's leasehold interest. They have failed to show what is the nature of that damage, what is the amount of that damage, and what is Walgro's basis in the leasehold interest. Accordingly, we conclude that petitioners have failed to bear their burden of proving error in respondent's determination that Walgro is not entitled to a casualty loss deduction on account of the flood damage to Hartley Island and the Annex. Petitioners' primary position is that Walgro was the true owner of Hartley Island and the Annex at the time of the flood. We have held, supra, that Walgro sold the properties to the Holgersons about a month earlier. Petitioners contend that, even if we were to hold that the Walgro-Holgersons transaction was a sale-leaseback, Walgro remained the owner of the trees. Petitioners do not direct our attention to any such reservation of ownership by Walgro. Whatever may be the merits of petitioners' contention as to the relevant property law, their analysis fails to deal with the basis question described supra.
We hold for respondent on this issue. III. Addition to Tax
Respondent maintains that the Greenlaws' 1972 Federal income tax return was filed several *261 days late, that the Greenlaws are not entitled to relief under section 7502, and that the Greenlaws do not have reasonable cause for their failure to timely file the tax return. It is not clear whether petitioners contend that the Greenlaws' tax return was timely filed, or that their tax return should be treated under section 7502 as having been timely filed. Petitioners complain about the unfairness of certain regulations (sec. 301.7502-1(c)(1)(iii)(b)(1), Income Tax Regs.), but do not ask us to hold these regulations invalid. Petitioners contend that they acted reasonably and not with willful neglect. We agree with respondent. An addition to tax for failure to file an income tax return when due is imposed under section 6651(a)(1)[32] *262 unless it is shown that such failure was due to reasonable cause and not due to willful neglect. Petitioners have the burden of proving error in respondent's determinations that additions to tax should be imposed. Ehrlich v. Commissioner,31 T.C. 536, 540 (1958). The Greenlaws' 1972 tax return was due June 15, 1973. It was received by the Internal Revenue Service on June 18, 1973. The envelope in which the return was mailed bears both a United States Postal Service postmark dated June 16, 1973, a date after the due date, and a private postage meter mark dated June 15, 1973, the due date. Under section 7502, if certain requirements are met, then a document may be treated as having been filed on the date it was mailed. We have held that, if the envelope in which the document is mailed is stamped with a United States postmark and also with a private postage meter mark, then the United States postmark controls. Malekzad v. Commissioner,76 T.C. 963, 966-968 (1981). *263 This is clearly what section 7502(a)(1) requires. The section 7502 regulation of which petitioners complain is valid. Malekzad v. Commissioner,76 T.C. at 967. Greenlaw testified that he obtained his return from his accountant about 6:00 p.m. on Friday, June 15, 1973, and that by the time he got his wife to sign it and then deposited it inside the post office, it was about 10:10 p.m. that night. Greenlaw offered no explanation as to why he was unable to pick up the return before the date it was due. Basically, Greenlaw cut it close; this time it was too close. Petitioners have failed to meet their burden of proof. We hold for respondent on this issue.
To reflect the concessions and settlements by the parties, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Harold H. Saur and Maribeth M. Saur, docket Nos. 10102-75, 1278-78; Fred W. Greenlaw and Mary T. Greenlaw, docket Nos. 10103-75, 1277-78; Francis J. Jacobus and Ruth A. Jacobus, docket Nos. 10104-75, 1280-78; Donald G. Black and Catherine B. Black, docket Nos. 10105-75, 1279-78; and Ross R. Sanborn and Caroline C. Sanborn, docket No. 1281-78.↩
2. Unless indicated otherwise, all chapter, subchapter, and section references are to chapters, subchapters, and sections of the Internal Revenue Code of 1954 as in effect for the years in issue. 3. Respondent, in an amendment to the answer in docket No. 9236-75, asserted increased deficiencies for 1967 and 1968 in the amounts of $1,179.97 and $3,857.01, respectively, and an increased addition to tax under section 6651(a) for 1968 in the amount of $385.70. Respondent concedes the asserted increased deficiency for 1967. Petitioners concede the amount of the increase in the deficiency for 1968 attributable to additional income in the amount of $5,000.00, and respondent concedes the remaining additional deficiency. Respondent further concedes both the amount of addition to tax under section 6651(a)↩ for 1968 determined in the notice of deficiency and the asserted increase in this addition to tax.
4. The parties have settled most of the adjustments made in the notices of deficiency. Petitioners in docket Nos. 9236-75, 10102-75, 10103-75, and 10105-75, however, do not assign error to certain of the other adjustments made in the notices of deficiency, and have not conceded or settled these other adjustments. Under Rule 34(b)(4), these other adjustments are deemed conceded by these petitioners. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure. The remaining adjustments in the notices of deficiency are derivative and depend on our resolution of the issues in dispute.
5. Walgro's fiscal year begins February 1 and ends January 31.↩
6. So stipulated. A summary of capital contributions to Walgro, prepared by an accountant for Walgro, shows capital contributions through 1965 totalled only $44,750. The parties have not favored us with an explanation of the difference between this total and the stipulated $57,500.↩
7. The parties have stipulated that McIntyre became a shareholder in "fiscal year 1968". However, Walgro's Form 1120-S and the accountant's summary (see n. 6, supra↩) show McIntyre becoming a Walgro shareholder in September 1968. Also, respondent's requested finding of fact that McIntyre became a Walgro shareholder in "the fiscal year ending January 31, 1969," was not objected to by petitioners. The Court concludes that the parties have, in effect, agreed to modify their stipulation on this point. See Rule 91(e). 8. The parties have stipulated that Charles became a shareholder in "fiscal year 1969". However, Walgro's Form 1120-S and the accountant's summary (see n. 6, supra) show Charles becoming a Walgro shareholder in February 1969. Also, respondent's requested finding of fact that Charles became a Walgro shareholder in "the fiscal year ending January 31, 1970," was not objected to by petitioners. The Court concludes that the parties have, in effect, agreed to modify their stipulation on this point. See Rule 91(e).
9. The total consideration provided by the purchasers appears to have come from a first mortgage provided by The Travelers Insurance Company in the amount of $300,000 (secured by first deeds of trust) and a second mortgage from M. E. Biggs and Betty Biggs, in the amount of $269,000 (secured by second deeds of trust).↩
10. Of the $569,000 total indebtedness on Hartley Island (see n. 9, supra), $474,166.65 was the amount for which petitioners were liable. Walgro already was liable for the remaining amount of this indebtedness and thus did not have to assume it.
11. The terms of the promissory note provided for simple interest at 7 percent per annum until December 1977 and thereafter at 4-1/2 percent per annum. Principal payments were to be made in the amount of $48,658.72 annually, from February 1, 1978, through February 1, 1997.↩
12. See Roemer v. Commissioner,69 T.C. 440, 454-457 (1977), affd. sub nom. Holgerson v. Commissioner,638 F.2d 104↩ (CA9 1981), which held that of this $250,000 prepaid interest, only $3,350.27 could be deducted by the Holgersons for 1967 (the year in which it was paid), $68,122.22 for 1968, and $68,122.22 for 1969, the three years dealt with in that opinion.
13. Walgro did not exercise its right to extend the lease for the additional 8 years. At the time of trial in the instant case, the Holgersons owned and operated the properties. ↩
14. By the end of 1976, the Holgersons had paid about $365,000 in principal and about $430,000 in interest on the indebtednesses on the properties (see table 2, supra↩).
*. Included in this amount is $68,122.52 of interest received from Holgerson on account of Walgro's sale of the properties to the Holgersons in 1967.
15. SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION. * * * (b) Effect.--If a small business corporation makes an election under subsection (a), then-- (1) with respect to the taxable years of the corporation for which such election is in effect, such corporation shall not be subject to the taxes imposed by this chapter * * *. [The subsequent revision of this provision by section 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant cases. Provisions similar to the former section 1372(b)(1)↩ appear in section 1363(a), applicable to taxable years beginning after December 31, 1982 (sec. 6(a) of the Act).] 16. SEC. 1373. CORPOPRATION UNDISTRIBUTED TAXABLE INCOME TAXED TO SHAREHOLDERS. (a) General Rule.--The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. [The subsequent revision of this provision by section 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant cases. Provisions similar to the former section 1373(a)↩ appear in section 1366(a)(1)(A), applicable to taxable years beginning after December 31, 1982 (sec. 6(a) of the Act).] 17. SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. (a) General Rule.--A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. [The subsequent revision of this provision by section 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant cases. Provisions similar to the former section 1374(a)↩ appear in section 1366(a)(1)(B), applicable to taxable years beginning after December 31, 1982 (sec. 6(a) of the Act).]
18. Section 1372(e)(5) provides, in pertinent part, as follows: SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION. * * * (e) Termination.-- * * * (5) Passive Investment Income.-- (A) Except as provided in subparagraph B, an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation. * * * (C) For purposes of this paragraph, the term "passive investment income" mean gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). [The subsequent revision of this provision by section 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant cases. Provisions similar to the former section 1372(e)(5)↩ appear in section 1362(d)(3), applicable to taxable years beginning after December 31, 1981 (sec. 6(b)(3) of the Act).] 19. An exception for the first two years of the active conduct of a trade or business (sec. 1372(e)(5)(B)↩ does not apply to the instant cases. 20. T.C. Memo. 1977-400↩.
21. The use of this term by petitioners in the instant cases brings to mind the ironic use of this term in Laura Z. Hobson's book of the same name.↩
22. See paragraphs (1) and (2) of section 7206; United States v. Cohen,617 F.2d 56 (CA4 1980); United States v. McGee,572 F.2d 1097↩ (CA5 1978). 23. Respondent contends that we should not apply the "strong proof" standard, which this Court applies when a taxpayer contends that the substance of the transaction is different from the form participated in by the taxpayer. Instead, respondent maintains, "petitioner[s] should be held to the even stricter standard of Commissioner v. Danielson,378 F.2d 711 (3d Cir. 1967)." Since we conclude that petitioners have failed to meet even the more lenient "strong proof" standard, we do not decide whether the Danielson standard should apply. See Throndson v. Commissioner,457 F.2d 1022, 1025 (CA9 1972), affg. Schmitz v. Commissioner,51 T.C. 306 (1968); Ledoux v. Commissioner,77 T.C. 293, 308 (1981), affd. 695 F.2d 1320 (CA11 1983). Also, we do not decide whether the facts of the instant cases are sufficiently similar to those of Spector v. Commissioner,641 F.2d 376, 384 (CA5 1981), revg. 71 T.C. 1017 (1979), to warrant consideration of a limited step away from the "strong proof" standard toward the Danielson↩ standard.
24. Although most of the leading cases dealing with the "strong proof" and Danielson approaches have involved covenants not to compete, these approaches are also applicable to other situations where the taxpayer seeks to disavow the form taken by the transaction in which the taxpayer participated. See, e.g., Miami Purchasing Service Corp. v. Commissioner,76 T.C. 818, 830 (1981); Spector v. Commissioner,supra.↩
25. See 10 Mertens, Law of Federal Income Taxation, sec. 59.03, p. 9 (1976). A common fallacy in offering opinion evidence is to assume that the opinion is more important than the facts. To have any persuasive force, the opinion should be expressed by a person qualified in background, experience, intelligence, familiarity with the property, and with the valuation problem involved. It should also refer to all the underlying facts upon which an intelligent judgment of valuation should be based.↩ The facts must corroborate the opinion; otherwise, the opinion will be discounted. [Fn. refs. omitted; emphasis in original.]
26. Nothing in the record suggests that the River Ranch had the negative value that appears to be implicit in moving from Waggener's advice to Black's conclusion.↩
27. Petitioners rely on this evidence only in connection with the casualty loss issue, discussed infra.↩
28. T.C. Memo. 1976-40↩.
29. Sec. 1.1372-4(b)(5)(iv)(a). The term "gross receipts" as used in section 1372(e) is not synonymous with "gross income". * * * The term "gross receipts" means the total amount received or accrued under the method of accounting used by the corporation in computing its taxable income. Thus, the total amount of receipts is not reduced by returns and allowances, cost, or deductions.
30. Petitioners contend that under sec. 1374, as shareholders of Walgro, they can deduct their pro rata shares of the losses sustained by Walgro from the casualty loss which occurred in January 1968, up to the amount of their adjusted bases in Walgro's stock. Our holding, supra, that Walgro's status as a subchapter S corporation terminated for its fiscal year 1970 and thereafter, does not affect Walgro's subchapter S corporation status for its fiscal year 1968. See section 1372(e)(5)(A). Petitioners are correct that they are entitled to deduct pro rata shares of losses, which Walgro is entitled to deduct, sustained during Walgro's fiscal year 1968. We conclude, infra, however, that petitioners have failed to meet their burden of proof as to Walgro's entitlement to a casualty loss deduction for its fiscal year 1968. Since Walgro is not entitled to a casualty loss deduction for its fiscal year 1968, it is not necessary for us to determine the amounts of petitioners' bases in their Walgro stock and to decide whether these bases are affected by petitioners' guarantees of any of Walgro's debts. See, e.g., Frankel v. Commissioner,61 T.C. 343, 347 (1973), affd. without published opinion 506 F.2d 1051 (CA3 1974); Prashker v. Commissioner,59 T.C. 172 (1972); Raynor v. Commissioner,50 T.C. 762↩ (1968).
31. Section 165 provides, in pertinent part, as follows: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.↩
32. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.